**In the Matter of Bradford MASON, et al., Petitioners.**

**No. 90–2736.**

United States Court of Appeals, Seventh Circuit.

Submitted Aug. 28, 1990.

Decided Oct. 17, 1990.

Stephen Laudig, Indianapolis, Ind., for petitioners.

Margo Barber, Marion County Legal Div., Yvonne W. Chisolm, Watkins & Lee, Indianapolis, Ind., for respondent.

Before COFFEY, FLAUM and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Canon 7(A)(1)(c) of the Code of Conduct for United States Judges provides that a judge should not "make a contribution to a political organization or candidate". Ongoing contributions, like other signs of partisanship, would detract from the appearance of impartiality that is important to the administration of justice. Many judges were involved in politics before taking the bench, however, and either held office themselves or helped others do so. Before Judge Tinder was appointed to the Southern District of Indiana in 1987 he made political contributions. Two of the beneficiaries are defendants in this suit, and the plaintiffs' lawyer is running for office against one of them. Plaintiffs asked Judge Tinder to step aside.

Plaintiffs maintain, in this suit under the Voting Rights Act, that precinct boundaries in Marion County, Indiana, have been manipulated to discriminate against black voters and candidates. Marion County is coextensive with the City of Indianapolis, and officials hold offices in each: for example, defendant William H. Hudnut, III, is both Mayor of Indianapolis and County Executive of Marion County. Judge Tinder gave $100 to Hudnut's 1983 campaign for reelection as mayor. He donated another $100 in 1986 to Faye I. Mowery's campaign for Marion County Clerk. Hudnut and Mowery are defendants in their official capacities only. Mowery is running for another term; Stephen Laudig, Mowery's opponent in the general election, represents the plaintiffs.

Judge Tinder referred to Chief Judge Brooks the question whether "his impartiality might reasonably be questioned", producing disqualification under 28 U.S.C. § 455(a). Chief Judge Brooks concluded: "Absent a strong showing of personal prejudice, this Court does not feel a reasonable person would presume that a careful and seasoned trial judge was biased in this situation." After receiving Chief Judge Brooks' advice, Judge Tinder declined to recuse himself, observing that the contributions were nominal and that the suit does not seek to create personal liability. Plaintiffs now ask us to issue a writ of mandamus removing Judge Tinder, the only route by which claims under § 455(a) may be reviewed in this circuit. *United States v. Balistrieri*, 779 F.2d 1191, 1204–05 (7th Cir.1985); *In re National Union Fire Insurance Co.*, 839 F.2d 1226, 1227 (7th Cir. 1988).

Section 455(a) asks whether a reasonable person perceives a significant risk that the judge will resolve the case on a basis other than the merits. This is an objective inquiry. *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 865, 108 S.Ct. 2194, 2205, 100 L.Ed.2d 855 (1988); *New York City Housing Development Corp. v.*

*Hart,* 796 F.2d 976 (7th Cir.1986); *Pepsico, Inc. v. McMillen,* 764 F.2d 458 (7th Cir. 1985). An objective standard is essential when the question is how things appear to the well-informed, thoughtful observer rather than to a hypersensitive or unduly suspicious person. Because some people see goblins behind every tree, a subjective approach would approximate automatic disqualification. A reasonable observer is unconcerned about trivial risks; there is always *some* risk, a probability exceeding 0.0001%, that a judge will disregard the merits. Trivial risks are endemic, and if they were enough to require disqualification we would have a system of preemptory strikes and judge-shopping, which itself would imperil the perceived ability of the judicial system to decide cases without regard to persons. A thoughtful observer understands that putting disqualification in the hands of a party, whose real fear may be that the judge will *apply* rather than disregard the law, could introduce a bias into adjudication. Thus the search is for a risk substantially out of the ordinary.

An objective standard creates problems in implementation. Judges must imagine how a reasonable, well-informed observer of the judicial system would react. Yet the judge does not stand outside the system; as a dispenser rather than a recipient or observer of decisions, the judge understands how professional standards and the desire to preserve one's reputation often enforce the obligation to administer justice impartially, even when an observer might be suspicious. Judges asked to recuse themselves hesitate to impugn their own standards; judges sitting in review of others do not like to cast aspersions. Yet drawing all inferences favorable to the honesty and care of the judge whose conduct has been questioned could collapse the appearance of impropriety standard under § 455(a) into a demand for proof of actual impropriety. So although the court tries to make an external reference to the reasonable person, it is essential to hold in mind that these outside observers are less inclined to credit judges' impartiality and mental discipline than the judiciary itself will be.

Notwithstanding this caution, we conclude that reasonable observers would not question Judge Tinder's ability and willingness to decide this case impartially. Before joining the bench, he supported the local candidates of the Republican Party. This cannot come as a big surprise to the plaintiffs, given the party holding the White House when Tinder became first the United States Attorney and then a judge. Politics plays a role in appointment to judicial office. Senators and other political figures who commend candidates to the President, like the members of the Executive Branch who add their favorites, rarely select either strangers or political adversaries. Merit selection of federal judges means selection by merit from among a group that rises to attention on other grounds—grounds not exclusively political, but often so. Harold W. Chase, *Federal Judges: The Appointing Process* (1972); Neil D. McFeeley, *Appointment of Judges: The Johnson Presidency* (1987). McFeeley concludes, *id.* at 85, that between half and four-fifths of all federal judges are involved in partisan politics before appointment: from the Eisenhower through the Reagan Administrations, the low was 48.4% (Johnson appointments to the district court) and the high 81.0% (Kennedy appointments).

Courts that have considered whether prejudicial political activity is also prejudicial regularly conclude that it is not. E.g., *Home Placement Service, Inc. v. Providence Journal Co.,* 739 F.2d 671, 675 (1st Cir.1984) (judge not disqualified although defendant was represented by law firm of judge's patron); *In re United States,* 666 F.2d 690 (1st Cir.1981) (judge not disqualified although the defendant had performed political favors for the judge's patron); cf. *Sierra Club v. Simkins Industries, Inc.,* 847 F.2d 1109 (4th Cir.1988) (membership in Sierra Club before joining the bench does not disqualify judge in litigation filed by the Sierra Club). In large measure this is so out of necessity. Much contemporary litigation challenges the conduct of government, so that many judges are asked to decide whether those whose

political goals the judges share (or oppose: there is no difference) have conducted their offices in keeping with the Constitution and laws. There are not enough political eunuches on the federal bench to resolve all cases with political implications; anyway it would be weird to assign all political cases to the naifs while concentrating antitrust and securities cases in the hands of the political sophisticates.

Put necessity to one side and the result would be the same. Reasonable, well-informed observers of the federal judiciary understand that judges with political friends or supporters regularly cast partisan interests aside and resolve cases on the facts and law. Judges with tenure need not toady, and don't. Chief Justice Burger wrote an opinion that led to the resignation of the President who gave him that office. *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Justice Holmes wrote a dissent in an antitrust case that President Roosevelt had personally decided to pursue, despite being a frequent guest at the Roosevelts' table. *Northern Securities Co. v. United States*, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679 (1904), discussed in Sheldon M. Novick, *Honorable Justice: The Life of Oliver Wendell Holmes* 261–73 (1989). Tenure of office, coupled with the resolve that comes naturally to those with independent standing in the community, have led a "political" judiciary in the United States to be more assertive in securing legal rights against the political branches than is the politically neutral, civil service judiciary in continental Europe. A reasonable, informed observer takes account of this history when deciding whether political connections call into question the judge's ability to render an impartial decision.

Hudnut and Mowery are not said to be Judge Tinder's sponsors. Although Mayor Richard J. Daley of Chicago had a significant voice when Senator Paul Douglas was making recommendations to Democratic Presidents, there are few other examples of mayors influencing appointments to the federal bench, and no known examples of county clerks doing so. Plaintiffs do not contend that any knowledgeable observer

would believe that Judge Tinder owes a political debt to Mayor Hudnut or Clerk Mowery, a debt he might be tempted to repay in this case. Judge Tinder aided their campaigns for office, and not they, his. Although donations show that Judge Tinder supported the general political approach of these candidates, this adds little to the knowledge that Hudnut and Mowery are Republicans, as Judge Tinder was. Any doubts about the judge's impartiality are especially weak because the complaint names Hudnut and Mowery in their official rather than personal capacities. That Mr. Laudig is running against Mowery in the November 1990 election adds nothing, once we conclude that reasonable observers would not think the Judge bent on saving Mowery's skin at the expense of the law. At all events the race began long after the case was assigned to Judge Tinder. If anyone is to drop out in order to keep the litigation on even keel, that person is attorney Laudig.

Oddly, no case discusses the question whether political contributions to a party create an appearance of impropriety. (*United States v. Alabama*, 571 F.Supp. 958 and 574 F.Supp. 762 (N.D.Ala.1983), holds that contributions to a partner of one of the lawyers do not create a problem.) Contributions raise less doubt than sponsorship, and in light of cases such as *Providence Journal* and *In re United States*, sponsorship and other indicia of political support in bygone days do not disqualify a judge. A judge who seeks promotion may be tempted to defer unduly to the decisions or preferences of potential supporters; this potential does not require disqualification, and the risks created by political contributions in earlier years are smaller.

If Judge Tinder were a close friend of Mayor Hudnut or Clerk Mowery we would have a more difficult problem. *Cf. Baker v. Detroit*, 458 F.Supp. 374 (E.D.Mich. 1978). Bonds of friendship have not been alleged. Similarly, we might have a much more difficult case if, as occurs in many states, the attorney gave significant financial support to the judge's campaign committee while the judge was on the bench.

Such contributions create opportunities to curry favor, and large ones could require disqualification. Contributions have both practical justifications (someone has to pay for the campaign in states that elect judges) and civic ones (attorneys know the most about who would make a good judge, and it would be regrettable to have ethical rules that put them on the sidelines). In the federal system, however, it is possible to maintain airtight financial separation between bench and bar, once the judge takes office. Judge Tinder has maintained that necessary separation. On the record plaintiffs made, there is no basis for disqualification—although the lack of precedent leads us to deny defendants' request for sanctions under Fed.R.App.P. 38. If evidence of *actual* bias comes to light, we will of course step in on appeal from the final judgment. The petition for a writ of mandamus is

DENIED.