**William F. MORRIS, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

**No. 97–141.**

United States Court of Veterans Appeals.

June 6, 1997.

Before FARLEY, Judge.*

## MEMORANDUM AND ORDER

FARLEY, Judge.

In the appellant's motion for panel review pursuant to Rule 35 of this Court's Rules of Practice and Procedure, he has alleged that this judge is "clearly biased toward [his] case" and "prejudiced toward [him]." Construing these statements as a motion for my recusal, that motion will be denied for the reasons stated below.[1]

### I. PROCEDURAL HISTORY

On January 24, 1997, the appellant filed a Notice of Appeal (NOA) from the January 14, 1997, decision of the Chairman of the Board of Veterans' Appeals (Board or BVA) denying reconsideration of a May 6, 1991, BVA decision. The BVA had received the appellant's motion for reconsideration on July 2, 1996, more than 120 days after the date stamped on the Board's decision. On March 27, 1997, the Clerk of the Court directed the appellant to show cause, within 20 days after the date of that order, why his appeal should not be dismissed for lack of jurisdiction. On April 2, 1997, the appellant filed a response in which he requested that the Court assume jurisdiction over his appeal. Alternatively, he requested that the Court order the Secretary to advance his appeal on the BVA docket. The appellant's response was accompanied by a letter to the Court dated March 31, 1997, the body of which stated, *in toto,* as follows:

> I hereby request this motion go before a Judge, that the Judges [sic] decision be reviewed by a panel of Judges, and that the panel of Judges [sic] decision be reviewed by the entire Court.
>
> Further, I request that the intial [sic] Judge not be Judge Farely [sic].

The docket sheet reflects that the appeal was assigned to me on April 3, 1997, pursuant to IOP Part I.(b)(2) which provides, in pertinent part, as follows: "A case is assigned ... on a rotational basis according to a roster managed by the Clerk." On April

* Editor's Note: This single-judge summary disposition is of no precedential value. See *Bethea v. Derwinski,* 2 Vet.App. 252, 254 (1992).

1. This Memorandum and Order is not dispositive of the merits of an appeal before the Court but of a motion which must be decided by me. For this reason, and because some or all of the other judges of this Court might be called upon to decide a motion for review of my decision if one is filed by the appellant (*See Aronson v. Brown,* 14 F.3d 1578 (Fed.Cir.1994)), I deemed the circulation procedures of Part II.(c) of the Court's Internal Operating Procedure, 7 Vet.App. XXIX, XXXII (1994) (IOP), to be inapplicable. Therefore, this Memorandum and Order was not circulated to the other judges for information and comment prior to filing.

21, 1997, I entered an Order denying the appellant's request for extraordinary relief and dismissing his appeal for lack of jurisdiction. The appellant's "request" pertaining to judicial assignment, which was not accompanied by any reason or justification, was not addressed in the Order.

On April 28, 1997, the appellant filed a request for a review of the single-judge dismissal by a three-judge panel pursuant to Rule 35. In accordance with Part III.(a)(1) of the IOP, the panel selected to consider the request consists of this judge, as the one originally assigned to the matter, and two other judges selected by lot. When a copy of the appellant's request reached my chambers, I took note of the following paragraph:

> A motion was made the initial judge not be Judge Farley. Without any comment the initial judge is Judge Farley, a career government employee that is clearly biased toward my case. I am a life member of the DAV and since he has allegedly resigned his life membership due to criticism in the DAV magazine, I feel he is prejudiced toward me.

In view of the specificity of the allegations of bias and prejudice and the stated reasons therefore, I concluded that the appellant's statement must be construed as a motion that I disqualify myself pursuant to 28 U.S.C. § 455 from any further consideration of his appeal.

## II. CONTEXTUAL BACKGROUND

The appellant's allegations that I was a career government attorney prior to becoming a judge and that I resigned as a life member of the Disabled American Veterans (DAV) because of criticism in a recent issue of DAV MAGAZINE are correct. To ensure that there is a complete record for my decision on the appellant's motion for recusal, and any review thereof, I will set out the events and circumstances which gave rise to my resignation from the DAV; the relevant articles and correspondence are included in the appendix to this Memorandum and Order.

I returned from Vietnam in January 1969 rather abruptly due to combat injuries, one of which was an above-knee amputation of my right leg, and was assigned to Walter Reed General Hospital in Washington, D.C. Shortly after my arrival, I was visited at my bedside by two representatives (there may have been more but memory dims a bit after almost thirty years) of the National Amputation Foundation (Foundation), an organization based in Long Island, NY, and made up solely of amputees from across the country. These wonderful ambassadors of good cheer provided (and continue to provide) an invaluable service to new and bewildered amputees. They serve as empathetic listeners, builders of morale, and examples of those who have successfully adapted to life as amputees. Impressed with their work, I soon joined the Foundation. In so doing I also became a member of the DAV because the Foundation is a DAV chapter. A year or so later, to avoid the expense of annual dues, I made a one-time payment and became a life member of the DAV.

Prior to my becoming a judge, I had given power of attorney to the DAV, and its employees represented me in connection with my claims for VA benefits. My memberships in both organizations were made a matter of record during my Senate confirmation hearings. *See Hearing Before the Senate Comm. on Veterans' Affairs,* 101st Cong. 81 (1989) (S.Hrg.101–467). While I saw neither a real nor an apparent conflict with continuing my life membership in the DAV once I became a judge, I did want to ensure that no DAV employee who might appear before me as the representative of a veteran would be, at the same time, my own representative. Therefore, upon confirmation and assumption of my judicial position, I revoked my grant of power of attorney to the DAV. Except for continuing to pay annual dues to the Foundation, playing in an annual charity golf tournament sponsored by a local DAV chapter, serving as a volunteer ski instructor at winter sports clinics sponsored jointly by the Department of Veterans Affairs and the DAV, and speaking as a judge about the Court to a DAV National Convention, my participation in the activities of both the Foundation and the DAV were, at best, passive; I never attended any chapter, local, or state meeting or took part in any other organizational activities.

On the evening of March 3, 1997, I arrived home and found in the mail the March/April 1997 issue of DAV MAGAZINE, which bills itself on its cover and masthead as "The

official voice of the Disabled American Veterans and DAV Auxiliary." The magazine contained an article entitled *VA Secretary Urged to Break Monopoly at "Veterans' Court."* *See* Appendix (App.), p. 1. The article, the author of which was not identified, stated that "[a]lthough there are two sides in an appeal to the [Court], the veteran and the government, all six of the judges currently sitting on the court are former government employees." Following the statement that "none of the present judges ever represented veterans in an advocacy role before being appointed to the court," a DAV official was quoted as stating that "[t]his situation is grossly unfair to veterans and must change." The official, who was identified as DAV Washington Headquarters Executive Director David W. Gorman, was further quoted as follows: "[v]eterans may rightly ask whether they are receiving truly independent judicial review"; "[i]t is fundamentally unfair for the government to pack the court with its lawyers to the total exclusion of members of the veterans' bar"; and "[t]he DAV is hopeful that the government's unbroken control over [the Court] will soon end."

I concluded that I had no choice but to disassociate myself from the DAV because the "official voice" of the DAV advocated to its members that the Court on which I sit is under the "unbroken control" of one party to each and every appeal, does not perform "truly independent judicial review" of veterans' claims, and does not issue "[f]air decisions" because its judges, including me, had previously served as attorneys in various agencies in the three branches of the federal government. Further, because I believed that the article impugned the integrity of the Court and had the potential to diminish the standing of the Court as an institution in the eyes of the members of the DAV, I was compelled by Canon 1 of the Code of Conduct for United States Judges to "uphold the integrity and independence of the judiciary." *See also* Comment 3 to Rule 8.2 of the Model Code of Professional Responsibility ("To maintain the fair and independent administration of justice, lawyers are encouraged to continue traditional efforts to defend judges and courts unjustly criticized."). Accordingly, on March 6, 1997, I sent a letter to the DAV in which I took issue with the stereotypical and false accusations in the article, expressed my concern that the article disserved the membership of the DAV, and resigned from the Foundation and the DAV. *See* App., pp. 295–297.

On March 20, 1997, a response from the DAV in the form of a letter from Mr. Gorman was hand-carried to the Court. *See* App. pp. 298–301. Although Mr. Gorman took the position that the article was ambiguous ("The article ... can lead different readers to varying conclusions."), he did concede, that my "reading" was a "reasonable one" and he expressed regret that the DAV had failed to communicate its views with clarity. He concluded by expressing the hope that "after considering [their] apology ..., [I] will think about continuing [my] membership in the DAV. DAV is always willing to acknowledge a mistake, learn from the experience and not repeat the error." I have not renewed my membership in either the DAV or the Foundation.

In the interest of completeness, I note that Mr. Gorman sent a copy of his response to each of the other judges. Chief Judge Nebeker responded with a letter dated March 21, 1997, in which he wrote that he was "saddened to learn that the DAV has lost the perspective it once possessed...." In urging a retraction of the article, the Chief Judge stated that the DAV's "thoughtless assertion ... does a disservice to all, particularly members of the DAV whom you gravely misinform." *See* App., p. 302. In an April 15, 1997, reply, Mr. Gorman advised the Chief Judge that the ambiguous nature of the article required a "clarification" and that one would be published in the next issue of DAV MAGAZINE. *See* App., p. 294. In his reply of April 18, 1997, the Chief Judge opined that there was nothing ambiguous about the statements in the article:

> I respectfully suggest that Mr. Gorman is asserting an ambiguity where none exists. The article, and Mr. Gorman's quotations therein, unequivocally stated that the Court had been packed by the government which has "unbroken control over [Court]." Since it is apparent your "clarification" will profess or imply a nonexistent ambiguity, it would seem only fair that you reproduce my letter of March 21 and this letter in juxtaposition to your effort at salvaging the misstep.

*See* App., p. 304.

The May/June 1997 issue of DAV MAGAZINE contained an article entitled *DAV Clarifies Stand on "Veterans' Court."* *See* App., p. 305. The article reported Mr. Gorman's statement in his letter to me that "the DAV regrets its failure to communicate with clarity its views with respect to [the Court] and the judges of the court."

> The DAV wishes to clarify that it was not our intent, as Judge Farley inferred, to suggest that the government controls the decisions handed down by the court. The DAV has every confidence in the court's independence.
>
> ....
>
> Further, it was not the intent of the DAV to mislead or imply to our readers that the court's decisions have been unfair or biased in any way. It was our intention to participate in the political process of selecting judges of the court by expressing our view of the qualities we believe those judges should possess.

In a May 7, 1997, letter, Mr. Gorman replied to the Chief Judge's request that the DAV publish his correspondence. *See* App., p. 306. Persisting in the view that the original article was ambiguous, Mr. Gorman wrote that

> DAV recognizes the subject article could lead different readers to varying conclusions. Therefore, we acknowledged the need to publish a clarification in the May/June issue of *DAV Magazine.* This has been accomplished.... While I recognize your concern and that which prompted Judge Farley to originally write, I am satisfied the DAV has responded to those concerns.

To date, the DAV has not acceded to the request of the Chief Judge that his letters be published in DAV MAGAZINE.

### III. APPLICABLE LAW

The statute pertaining to the disqualification of judges, 28 U.S.C. § 455, has been made specifically applicable to judges of the Court of Veterans Appeals by operation of 38 U.S.C. § 7264(c). *See Aronson,* 14 F.3d at 1581. The portions of 28 U.S.C. § 455 pertinent to the appellant's allegations of bias and prejudice are:

> (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b) He shall also disqualify himself in the following circumstances:
>
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

■ The Supreme Court, in interpreting § 455(a), has made it clear that it is the appearance of partiality and not whether a judge subjectively believes himself or herself to harbor bias or prejudice which is controlling. "The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 865, 108 S.Ct. 2194, 2205, 100 L.Ed.2d 855 (1988). More recently, the Court in *Liteky v. United States,* stated that "what matters is not the reality of bias or prejudice, but its appearance. Quite simply and quite universally, recusal [is] required whenever 'impartiality might reasonably be questioned.'" 510 U.S. 540, 548, 114 S.Ct. 1147, 1154, 127 L.Ed.2d 474 (1994).

The United States Court of Appeals for the Federal Circuit recently placed § 455 in a historical context.

> Before 1974, § 455 required "any justice or judge ... to disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or proceeding therein." Section 455 was amended in 1974 to clarify and broaden the grounds for judicial disqualification and to conform with the recently adopted ABA Code of Judicial Conduct, Canon 3 C. The revised provision also omitted the phrase "in his opinion", in order to eliminate the subjective standard. *See* H.R.Rep. No. 93-1453 (S.Rep. No. 93-419), 93d Cong., 2d Sess. 5 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6351, 6354-55. The purpose was explained in *Roberts v. Bailar,* 625 F.2d 125, 129 (6th Cir.1980):
>
> To promote public confidence in the impartiality of the federal judicial system, the Congress in 1974 shifted the focus of § 455.... No longer is a judge's intro-

spective estimate of his own ability impartially to hear a case the determinate of disqualification under § 455. The standard is now objective.

*Aronson,* 14 F.3d at 1582–83.

Generally, the basis for disqualification is extra-judicial rather than stemming from the present or prior judicial proceedings. "It is wrong in theory, though it may not be far off the mark as a practical matter, to suggest, as many opinions have, that 'extrajudicial source' is the *only* basis for establishing disqualifying bias or prejudice. It is the only *common* basis, but not the exclusive one, since it is not the *exclusive* reason a predisposition can be wrongful or inappropriate." *See Liteky,* 510 U.S. at 551, 114 S.Ct. at 1155. "The point of distinguishing between 'personal knowledge' and knowledge gained in a judicial capacity is that information from the latter source enters the record and may be controverted or tested by the tools of the adversary process. Knowledge received in other ways, which can be neither accurately stated nor fully tested, is 'extrajudicial.'" *Edgar v. K.L.,* 93 F.3d 256, 259 (7th Cir.1996).

One such "common" basis is a personal interest in litigation due to financial holdings or personal activities. In *Liljeberg,* for example, Justice Stevens, writing for the Court, adopted the view of the Chief Judge of the Court of Appeals that an appearance of partiality could result from the perception that the judge had an interest in the litigation due to his service on the Board of Trustees of a university which could have benefited from the litigation:

> The goal of section 455(a) is to avoid even the appearance of partiality. If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created even though no partiality exists because the judge does not recall the facts, because the judge actually has no interest in the case or because the judge is pure in heart and incorruptible.

*Liljeberg,* 486 U.S. at 860, 108 S.Ct. at 2203 (quoting *Health Services Acquisition Corp. v. Liljeberg,* 796 F.2d 796, 802 (5th Cir.1986)). *See also First National Bank of Louisville v. Lustig,* 96 F.3d 1554 (5th Cir., 1996) (Court expressed its "dismay" at the failure of the district judge to recuse himself in light of his substantial holdings of stock in the plaintiff, but found the error under 28 U.S.C. § 455 to be "harmless.").

Another basis for disqualification is personal relationships. In *United States v. Tucker,* 78 F.3d 1313 (8th Cir.1996), the court granted the request of the independent counsel under § 455(a) for the assignment of another trial judge "because of the 'unmistakable appearance' of bias or partiality here." *Id.* at 1324. The basis for the court's ruling was the "widely reported" relationships among the original judge, President and Mrs. Clinton, and the defendant, Jim Guy Tucker. On the other hand, *In re Charge of Judicial Misconduct or Disability,* 85 F.3d 701 (D.C.Cir.1996), involved a challenge to a circuit judge who had participated in the appointment of an independent counsel on the grounds that "the judge is a close friend of a United States Senator who called for the appointment of an independent counsel ... and that the Senator employs the judge's wife as a receptionist." *Id.* at 703. The Judicial Council expressed doubts whether § 455 applied directly, but it went on to affirm the decision of the Chief Judge that there was no basis for disqualification.

> Of course one might say that the judge, because of his wife's position, would be grateful to the Senator and inclined to act or vote in a way the Senator would approve. But the same could be said in cases involving statutes the Senator endorsed or issues the Senator supports or opposes. Such cases doubtless come before this judge, when he is sitting as a circuit judge, yet no reasonable person would think he should recuse himself in those cases.

*Id.* at 704.

Regardless of the basis for the alleged partiality or bias, the essential question is "how things appear to the well-informed, thoughtful observer rather than to a hypersensitive or unduly suspicious person." *See Hook v. McDade,* 89 F.3d 350, 354 (7th Cir., 1996) (quoting *In re Mason,* 916 F.2d 384, 385–86 (7th Cir., 1990)). With regard to this

objective "reasonable person" standard, the 7th Circuit also noted:

> Trivial risks are endemic, and if they were enough to require disqualification we would have a system of preemptory strikes and judge-shopping, which itself would imperil the perceived ability of the judicial system to decide cases without regard to persons. A thoughtful observer understands that putting disqualification in the hands of a party, whose real fear may be that the judge will apply rather than disregard the law, could introduce a bias into adjudication. Thus the search is for a risk substantially out of the ordinary.

*Ibid.* As Justice Kennedy wrote in his concurring opinion in *Liteky:*

> Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." For present purposes, it should suffice to say that § 455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings. I think all would agree that a high threshold is required to satisfy this standard. Thus, under § 455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute.

510 U.S. at 557–58, 114 S.Ct. at 1158 (Kennedy, J., concurring.)

## IV. APPLICATION OF LAW TO THE FACTS

The appellant does not suggest that I have a personal or financial stake in the outcome of his appeal and the record would not support even the hint of an appearance of any such suggestion. Similarly, there is no basis for a claim that I am involved in any sort of disqualifying personal relationship. The questions presented are whether I am disqualified from considering this appeal either by virtue of my prior government service or because the appellant has identified himself as a member of the DAV, an organization with which I recently expressed my disagreement and from which I resigned.

### A.

The appellant suggests that I am biased against his case due to my prior service as a "career government employee." Simply stated, I reject the suggestion that my impartiality, or that of any sitting federal magistrate, judge, or justice, "might reasonably be questioned" on that basis. During the Senate confirmation process, I was asked a related question, albeit from a different perspective. The question and my response, which are matters of public record, were as follows:

> *Question 2.:* Please describe the aspects of your record in the Department of Justice, other Federal service, and other employment or experiences that would lead a veteran or veteran's dependent or survivor seeking assistance from the Federal Government to believe that you would give his or her case sympathetic consideration.
>
> *Response to Question 2.:* As a judge-designate, it would, of course, be inappropriate for me to "convey or permit others to convey the impression that they are in a special position to influence [me]." (Code of Judicial Conduct for United States Judges at Canon 2.) I would approach every case with an open mind without a prejudgment resulting from either antagonism or sympathy toward any party or claim.
>
> With regard to my record, I am a veteran, a disabled veteran. I entered the Army as a private E–1 in June, 1966, and retired in April, 1970, as a captain. I went through basic training, advanced artillery training and Officer Candidate School. After one year at Fort Meade, Maryland, I joined the 25th Infantry Division in Vietnam and spent ten months in the field as a forward observer and battery executive officer. Like thousands of veterans, I have seen combat; I received four Bronze Star Medals, two Purple Heart Medals and the Army Commendation Medal. Like thousands of veterans, I was wounded; I spent fourteen months in Walter Reed Army Medical Center before I retired due to

disability. Like thousands of veterans, I took advantage of veterans benefits; I attended Hofstra University School of Law where I was Editor-in-Chief of the Hofstra Law Review and graduated first in my class. I joined the Department of Justice in 1973 and I have worked since then on tort cases arising from the entire spectrum of governmental activity. Where there was no basis in fact or in law for a recovery, I worked hard in defense of the interests of the United States; on the other hand, when there was justification for compensation, I have endeavored to insure that [every] injured plaintiff was treated fairly in the firm belief that the government, perhaps more so than other litigants, has a duty and a responsibility to compensate those injured by the acts of its employees. Finally, I believe that I have developed a particular sensitivity to the needs of individuals in difficult situations from my representation of and addresses to literally thousands of federal public servants.

S. Hrg. 101–467 at 137–38. If I were to be asked the same question today, my response would be identical. Rather than a basis for disqualification, I believe that my prior government service qualifies me for my present position and I do not believe that it could be said to give rise even to a hint of partiality. "No reasonable person would think" that I, or any other federal judge "should recuse himself" or herself from a case involving the government merely because the judge previously served in the government. *In re Charge of Judicial Misconduct or Disability,* 85 F.3d at 704.

B.

With regard to the article in the March/April issue of DAV MAGAZINE and my resignation from the DAV, there was no ambiguity in the original article and I had an obligation to deny the irresponsible allegations in the article and to disassociate myself from the organization which espoused them. Indeed, I would do so again. Further, I do not believe that, using Mr. Gorman's words, an "intention to participate in the political process" creates a license to inject irresponsible charges into that process no matter how noble one might believe his ultimate goal to be. Nevertheless, in his letter to me of March 20, 1997, Mr. Gorman wrote that the DAV recognized that it had made a "mistake" and offered an "apology." Although these words did not appear in the clarification printed in the May/June issue of DAV MAGAZINE, Mr. Gorman's concessions are accepted in the spirit in which they were made. It is the statements, not the organization or the individuals, with which I was compelled to take issue and, in the final analysis, I believe those statements to have resulted from an absence of thought rather than thoughtful consideration. I know of no reason to question Mr. Gorman's statement that the "DAV is always willing to acknowledge a mistake, learn from the experience and not repeat the error." I do not now harbor and have not in the past harbored any personal bias, prejudice, or ill-will against this appellant, or, for that matter, against the author of the article, Mr. Gorman, the DAV, its officers, or any of its members. Indeed, I continue to consider many of its officers and members as friends and, as I stated in my letter of correction and resignation, I will continue to work with disabled veterans.

That I harbor no personal bias or prejudice does not, however, resolve the appellant's motion because, under § 455 as well as *Liljeberg, Aronson, Liteky, et al.*, the test "is not the reality of bias or prejudice, but its appearance." *Liteky,* 510 U.S. at 548, 114 S.Ct. at 1154. The issue, therefore, is whether my "impartiality might *reasonably* be questioned." 28 U.S.C. § 455(a) (emphasis added). Stated another way, and paraphrasing the 7th Circuit in *Hook, supra,* and Justice Kennedy in *Liteky, supra:* Does my refutation of the allegations which appeared in DAV MAGAZINE and my resignations from the DAV and the National Amputation Foundation evince an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a well-informed, thoughtful observer to have reasonable grounds to believe that I harbor an aversion, hostility, or disposition of a kind that a fair-minded person could not set aside when judging an appeal brought by a member of the DAV? I believe that answer must be and is: "No."

The essence of the appellant's claim is derivative in nature and based solely upon his membership in the DAV. The DAV is not a party to this appeal, however, and the appellant's membership in the DAV has no bearing upon the substance of his appeal. Moreover, there was never any indication that the irresponsible allegations sprang from the DAV membership. In fact, and as amply demonstrated in my letter of resignation, it was my concern for the members of the DAV and their having been misinformed by the DAV MAGAZINE article that served as a major part of the impetus for my taking issue with the article. Under these circumstances, the claim of a derivative bias based upon the appellant's membership in the DAV is simply too attenuated a basis to support a reasonable belief that I could not arrive at a fair and impartial judgment in his appeal. Therefore, I conclude that my objections to the article and Mr. Gorman's statements, as well as my resignations from the DAV and the National Amputation Foundation, cannot reasonably form the basis for questioning my impartiality merely because the appellant is a member of the DAV.

## V. ORDER

Accordingly, for the reasons stated above, the appellant's motion that I disqualify myself pursuant to 28 U.S.C. § 455 from consideration of this appeal is DENIED.

*It is so Ordered.*

## APPENDIX

### VA Secretary Urged To Break Monopoly at "Veterans' Court"

The Court of Veterans Appeals (COVA) was established in 1988 solely that millions of veterans and their dependents would have the right to judicial review of decisions from the VA. The DAV has strongly supported veterans' right to judicial review of appealed claims decisions, yet none of the present judges ever represented veterans in an advocacy role before being appointed to the court.

"This situation is grossly unfair to veterans and must change," said Washington Headquarters Executive Director David W. Gorman. "There should at least be an approximate balance between former government lawyers and veterans' advocates serving on the court. That's why VA Secretary Jesse Brown should recommend to President Clinton that the next COVA judge be selected from among the veterans' bar."

Although there are two sides in an appeal to the COVA, the veteran and the government, all six of the judges currently sitting on the court are former government employees. In fact, no veterans' lawyer has ever served on the court. The result is that the point of view of veterans' advocates is not articulated during the deliberations of the "Veterans Court."

"Veterans may rightly ask whether they are receiving truly independent judicial review when one side, the government, has the exclusive power to appoint judges and uses that power to monopolize the court by excluding veterans' advocates from the bench," said Mr. Gorman. "COVA was created for veterans; not the VA."

There is presently one vacancy on the court. The DAV, along with the Non-Commissioned Officers Association, Military Order of the Purple Heart, Paralyzed Veterans of America, Veterans of Foreign Wars, and Vietnam Veterans of America, have written to the President, Secretary Brown, and leaders in Congress, urging that a veterans' advocate be nominated to fill the current vacancy. These veterans' service organizations have made it known that they oppose the nomination of yet another government lawyer.

"It is fundamentally unfair for the government to pack the court with its lawyers to the total exclusion of members of the veterans' bar," said Mr. Gorman.

"The DAV is hopeful that the government's unbroken control over COVA will soon end," noted Mr. Gorman. "We recognize that there will be great pressure on Secretary Brown from those who would like to see the government retain its monopoly on the court. We urge him not to yield."

Fair decisions from the court require that judges with experience representing veterans participate in the court's deliberations. Hundreds of attorneys presently represent veterans before the COVA. Several of these veterans' advocates have excellent credentials which make them highly qualified to join the court.

"The DAV sincerely hopes that Secretary Brown will continue to put the interests of veterans ahead of all others by ensuring that the next judge of the Court of Veterans Appeals is selected from among the members of the veterans' bar," said Mr. Gorman. ■

Page 10 DAV MAGAZINE

# United States Court of Veterans Appeals

Chambers of
Judge John J. Farley, III

625 Indiana Avenue, N.W., Suite 900
Washington, D.C. 20004
202-501-5882

March 6, 1997

Mr. Gregory C. Reed
National Commander
Disabled American Veterans
P. O. Box 14301
Cincinnati, OH 45250-0301

Dear Commander Reed:

For over a quarter of a century, I have been proud to be a life member of the Disabled American Veterans. It is, therefore, with deep regret that I am compelled to terminate my membership. The position of the DAV announced in the article entitled *VA Secretary Urged to Break Monopoly at "Veterans' Court"* (page 10, March/April issue of DAV MAGAZINE), which includes statements attributed to Washington Headquarters Executive Director David W. Gorman, who I must assume was speaking on behalf of the DAV, has made my continued membership untenable.

This article reports that the DAV, along with other veterans service organizations, has urged the Secretary of Veterans Affairs to recommend that the President appoint an attorney experienced in representing veterans to fill the current vacancy on the United States Court of Veterans Appeals. Certainly there are a number of qualified individuals with such experience, any one of whom would make a welcome contribution to the work of the Court. In urging that they be considered, the DAV acts as a responsible advocate. There would be no problem if that were the end of the article; sadly, it is not.

The article goes on to call into question the integrity of the judges presently sitting on the Court solely on the basis of their having previously served in various branches and agencies of the United States government. Such an unsubstantiated stereotypical attack is no more responsible than it would have been had it been based upon age, race, gender, or nationality. It is irresponsible to suggest to the DAV membership, as does Mr. Gorman, that because the judges previously were lawyers in government service, "[v]eterans may rightly ask whether they are receiving truly independent judicial review . . . ." Mr. Gorman misleads the members of the DAV and impugns

the integrity of every judge on the Court when he states that the government (which I can only assume to be a reference to the Department of Veterans Affairs) has "unbroken control over [the Court]" and, by inference, over the decisions of the Court.

The article fails to mention that five of the six sitting judges served in the military and that the nominations of at least three of the sitting judges, including this one, were specifically and enthusiastically endorsed by the DAV. It also ignores the fact that when the Court was created in 1988, very, very few attorneys were engaged in the representation of veterans; in 1989 and 1990, when the current judges were appointed, the veterans bar was virtually nonexistent. I, for one, am proud of my service to the nation as a combat veteran, as a Department of Justice attorney, and now as a judge on this Court. The implication of Mr. Gorman and DAV MAGAZINE that my former government service somehow, in some unspecified way, has impinged upon my ability to honor my oath and to conduct independent judicial review is wholly without foundation.

Given the appalling absence of judgment reflected in the article, it is understandable that the author is not identified. Viewed in the most favorable light, the article is naive and uninformed; in the worst, it is malicious and, perhaps, driven by some unannounced agenda. In either event, its publication by DAV MAGAZINE does not well serve the members of the DAV. The same may be said about the comments attributed to Mr. Gorman; if they are not his but were prepared for him by another, then he too was ill served.

Judges and courts are not above criticism, but criticism serves no constructive purpose when, as here, it consists of unfounded allegations of partiality. It might be possible for others just to dismiss the article in Shakespearean fashion, i.e., as "a tale told by an idiot, full of sound and fury, signifying nothing;" however, I am unable to do so because I am *both* a judge of the Court *and* a DAV member. In my view, every member of the bar, including those attorneys who happen to be employed by DAV, would be compelled by Rule 8.2 of the Model Code of Professional Responsibility to take issue with and to demand a retraction of what is explicit and implicit in the DAV MAGAZINE article. Comment 3 to that Rule provides: "To maintain the fair and independent administration of justice, lawyers are encouraged to continue traditional efforts to defend judges and courts unjustly criticized." That obligation is even greater for judges who, under Canon 1 of the Code of Conduct for United States Judges, must "uphold the integrity and independence of the judiciary."

Mr. Gorman and the DAV certainly enjoy a right of constitutional dimension to hold and express opinions and beliefs of any and every variety, both rational and irrational. However, it is my obligation under law to dissociate myself from such expressions, and from any organization which espouses them, when, as here, they conflict with my professional responsibilities. I am a disabled American veteran, and

I will continue to work with disabled American veterans, but I can no longer belong to an organization which publicly calls into question the integrity of the Court on which I am proud to serve.

With a profound sense of disappointment in the leadership of the DAV for the position it has taken, I hereby relinquish my lifetime membership and, effective immediately, resign as a member of the Disabled American Veterans.

Sincerely yours,

John J. Farley, III

cc: Mr. Arthur H. Wilson
National Adjutant and
Publisher, DAV MAGAZINE
Disabled American Veterans
P. O. Box 14301
Cincinnati, OH 45250-0301

Mr. David W. Gorman
Executive Director
Washington Headquarters
Disabled American Veterans
807 Maine Avenue, SW
Washington, D.C. 20024

National Amputation Chapter
Disabled American Veterans
73 Church Street
Malverne, NY 11565

Motto: "If I cannot speak good of my comrade, I will not speak ill of him."

DISABLED AMERICAN VETERANS

NATIONAL SERVICE and LEGISLATIVE HEADQUARTERS
807 MAINE AVENUE, S.W.
WASHINGTON, D.C. 20024
(202) 554-3501

March 20, 1997

The Honorable John J. Farley, III
United States Court of Veterans Appeals
625 Indiana Avenue, N.W., Suite 900
Washington, DC 20004

Dear Judge Farley:

Thank you for your letter of March 6, 1997. The article which appears in the current issue of the *DAV Magazine*, and to which you refer in your letter, can lead different readers to varying conclusions. This should never be the case. We find that your reading is a reasonable one. DAV deeply regrets its failure to communicate with clarity its views with respect to the United States Court of Veterans Appeals and the judges of the court.

DAV's intention has always been to participate in the political process of selecting future judges of the court by expressing its view of the qualities we believe those judges should possess. At the same time, we have, prior to this article, always expressed the esteem in which the sitting judges are held by the DAV. As you point out, DAV enthusiastically supported the nominations of the sitting judges. And, we continue to support them. Following the untimely death of Judge Mankin, then National Commander Thomas A. McMasters, III wrote to the President (copy attached) last summer on the subject of Judge Mankin's successor. Commander McMasters wrote: "The judges of the Court have earned the respect of the veterans community. The Court has brought significant improvement in the manner in which laws governing veterans' benefits are interpreted and applied." That has always been, and continues to be, DAV's opinion with respect to the sitting judges.

The issue we have previously raised, and intended to raise again in the article about which you wrote, was one of perspective. As Commander McMasters went on to write immediately following the above quote: "We nonetheless think it indisputable that the Court, the parties who appear before it, and the administration of justice will benefit from the diversity of background and unique perspective that adding a veterans' law practitioner will bring to the bench." The fact that a veterans' law practitioner would provide diversity of background among the judges of the court does not in any way imply that DAV believes bias exists on the court. We intended the article to focus on the selection of future judges. And be assured, DAV would be intolerable of any type of bias existing in the future.

The Honorable John J. Farley, III
March 20, 1997
Page 2

We are grateful for your comments with respect to a number of veterans' advocates being qualified to fill the current vacancy on the court. However, DAV believes that mere consideration of such candidates is insufficient. Our position is that one must be nominated and confirmed. This is not meant to suggest that merely because a lawyer's experience is mainly, or even exclusively, in Government practice detracts from his or her suitability to serve on the court. DAV is well aware and appreciative of the many fine lawyers who have dedicated their professional careers to Government service.

DAV did not intend its magazine article to reflect on the nominations, confirmations, or qualifications of any of the sitting judges. We intended to influence the nomination of future judges in a way which would benefit all parties, the court, the Government and the veterans community.

We hope that after considering our apology and learning of our long-standing and publicly expressed high regard for the court and all of its judges, you will think about continuing your membership in the DAV. DAV is always willing to acknowledge a mistake, learn from the experience and not repeat the error.

Sincerely,

DAVID W. GORMAN
Executive Director
Washington Headquarters

DWG:py
Attachment
cc: National Commander Gregory C. Reed
National Adjutant Arthur H. Wilson
Honorable Frank Q. Nebeker, Chief Judge
Honorable Ronald M. Holdaway
Honorable Donald L. Ivers
Honorable Kenneth B. Kramer
Honorable Jonathan R. Steinberg

Motto: "If I cannot speak good of my comrade, I will not speak ill of him."

NATIONAL SERVICE and LEGISLATIVE HEADQUARTERS
807 MAINE AVENUE, S.W.
WASHINGTON, D.C. 20024
(202) 554-3501

June 20, 1996

VIA FEDERAL EXPRESS

Honorable William J. Clinton
The White House
1600 Pennsylvania Ave., N.W.
Washington, DC 20500

Dear Mr. President:

The Disabled American Veterans seeks your support in remedying an imbalance on the United States Court of Veterans Appeals. The Court was established in 1988 solely that millions of veterans, their dependents and active duty military personnel would have the right to judicial review of decisions on their claims for benefits from the Department of Veterans Affairs. We believe, and hope you will agree, that fundamental fairness requires that people with experience and a strong background defending the rights of veterans no longer be excluded from the bench of this Court. DAV urges you to nominate a member of the veterans' bar to fill the current vacancy on the Court of Veterans Appeals.

The Court serves a large but very specialized group of litigants. The Secretary of Veterans Affairs is the appellee in every appeal. Opposing the Secretary is a veteran or the veteran's survivor who is most often unrepresented by counsel. Appeals to the Court pit the disappointed and frequently indigent appellant, whose claim has been denied by the VA, against the United States Government with all of its resources. The VA and the military control the record upon which the case is decided: the VA writes the regulations under which the claim is adjudicated: VA physicians evaluate the veteran's disability; the VA employs the adjudicators and hearing officers who decide the claim: and the VA convenes the Board of Veterans' Appeals that reviews the original department decision. Veterans view their battle to obtain benefits as an unequal struggle from the beginning.

Unfortunately, the composition of the Court exacerbates and reinforces veterans' perception that the playing field upon which their claims are adjudicated is not level. There were few lawyers practicing veterans' law prior to 1989. When the seven original judges were chosen in 1989 and 1990, no pool of qualified veterans' advocates existed from which potential judges could be selected. The result of the original selection process is that the Court is comprised of a

Hon. William J Clinton
June 20, 1996
Page 2

former VA General Counsel, a former Department of Justice official and representatives from the Department of Defense, among other former Government personnel. All of the judges have extensive Government backgrounds, while none previously advocated on behalf of individual veterans. The exclusion of advocates for veterans and their dependents from the bench of the "Veterans Court," while understandable in the context of the conditions which existed in 1989, should not continue.

The term "Veterans Court" does not imply merely that veterans are the only parties appealing to the Court or that the members of the Court are veterans. Indeed, many of the present judges are veterans. "Veterans Court" connotes more. To the DAV it includes the principle that those entrusted with deciding these cases not exclude the veterans' bar. The judges of the Court have earned the respect of the veterans community. The Court has brought significant improvement in the manner in which laws governing veterans' benefits are interpreted and applied. We nonetheless think it indisputable that the Court, the parties who appear before it, and the administration of justice will benefit from the diversity of background and unique perspective that adding a veterans' law practitioner will bring to the bench.

More than 1,200 lawyers have joined the Court's bar since 1989. Although approximately 100 are Government counsel, the overwhelming majority represent veterans and their dependents. For many of these attorneys veterans' law is only a small part of a diverse practice, and most have taken only one or two cases to the Court. However, a significant minority specialize in veterans' law. A number of these people have distinguished themselves in this area of practice and demonstrated their qualifications to serve on the Court. More than any others, these lawyers have been instrumental in the evolution of the case law which forms the foundation of stare decisis for this Court as well as the development of the Court's rules and procedures. The DAV earnestly hopes you will nominate the next judge of the Court of Veterans Appeals from among this group of veterans' practitioners.

Thank you for your attention to this very important matter. We look forward to your decision and hope you are able to join us at our National Convention this summer.

Sincerely,

Thomas A. McMasters, III
National Commander

c: Hon. Jesse Brown
American Legion
AMVETS
Paralyzed Veterans of America
Veterans of Foreign Wars
Vietnam Veterans of America

# United States Court of Veterans Appeals

Chambers of
Chief Judge Frank Q. Nebeker

March 21, 1997

625 Indiana Avenue, N.W., Suite 900
Washington, D.C. 20004
202-501-5862

Mr. Gregory C. Reed
National Commander
Disabled American Veterans
807 Maine Avenue, S.W.
Washington, D.C. 20024

Dear Mr. Reed:

I am in receipt of the DISABLED AMERICAN VETERANS MAGAZINE, March/April 1997. Upon reading the box report on page 10, I am saddened to learn that the DAV has lost the perspective it once possessed when the organization supported the enactment of judicial review. All understood then, and should know now, that the Court was to be, and is an objective and impartial decider of appeals by benefits claimants receiving adverse decisions by the Board of Veterans Appeals.

To advocate the appointment of one seemingly possessed of a particular bias is the right of anyone. But the thoughtless assertion that there exists "unbroken control over COVA" by the government, does a disservice to all, particularly members of the DAV whom you gravely misinform. In light of Mr. David W. Gorman's March 20, 1997, response to Judge Farley's letter of resignation of March 6, 1997, I urge that you inform your membership of your retraction of that unfortunate accusation. Indeed, Mr. Gorman's letter acknowledges that Judge Farley reasonably read that article as an accusation of bias on the part of the Court. Surely, your membership will also believe as true that admittedly false indictment.

Sincerely,

Frank Q. Nebeker
Chief Judge

*Motto: "If I cannot speak good of my comrade, I will not speak ill of him."*

**DISABLED AMERICAN VETERANS**

NATIONAL SERVICE and LEGISLATIVE HEADQUARTERS
807 MAINE AVENUE, S.W.
WASHINGTON, D.C. 20024
(202) 554-3501

April 15, 1997

The Honorable Frank Q. Nebeker
Chief Judge
United States Court of Veterans Appeals
625 Indiana Ave., N.W., Suite 900
Washington, DC 20004

Dear Chief Judge Nebeker:

Your letter of March 21, 1997, to National Commander Gregory C. Reed has been referred to me.

As I wrote in my March 20, 1997, letter to Judge Farley, our recent article in the March April *DAV Magazine* can lead different readers to varying conclusions. To the extent the article can be misinterpreted as implying that DAV views the court as biased, we intend to publish a clarification in the May/June issue of *DAV Magazine*. We have stated, and will state again, that DAV does not perceive bias on the court. To the contrary, DAV continues to believe the court has greatly improved the administration of the law for those claiming VA benefits.

Satisfied this has responded to your concern, I remain

Sincerely,

DAVID W. GORMAN
Executive Director, Washington Headquarters

United States
Court of Veterans Appeals

Chambers of
Chief Judge Frank Q. Nebeker

625 Indiana Avenue, N.W., Suite 900
Washington, D.C. 20004

April 18, 1997

BY HAND

Mr. Gregory C. Reed
National Commander
Disabled American Veterans
807 Maine Avenue, S.W.
Washington, D.C. 20024

Dear Mr. Reed:

I have received Mr. Gorman's letter, dated April 15, 1997, responding, by delegation from you, to my letter to you of March 21, 1997. Mr. Gorman says that the subject article ". . . can lead different readers to varying conclusions. To the extent the article can be misinterpreted as implying that DAV views the court as biased" a "clarification" will be published in the next issue of your magazine.

I respectfully suggest that Mr. Gorman is asserting an ambiguity where none exists. The article, and Mr. Gorman's quotations therein, unequivocally stated that the Court had been packed by the government which has "unbroken control over COVA". Since it is apparent your "clarification" will profess or imply a nonexistent ambiguity, it would seem only fair that you reproduce my letter of March 21 and this letter in juxtaposition to your effort at salvaging the misstep.

Sincerely,

Frank Q. Nebeker
Chief Judge

COVA Update

# DAV Clarifies Stand on "Veterans' Court"

An article in the March/April *DAV Magazine* urging that a member of the veterans' bar be appointed to the Court of Veterans Appeals (COVA) has been called "an unsubstantiated stereotypical attack" on the court's sitting judges.

COVA Judge John J. Farley wrote that the article had cast doubt on the integrity of the judges "solely on the basis of their having previously served in various branches and agencies of the United States government."

In his response, Washington Headquarters Executive Director David W. Gorman said the DAV regrets its failure to communicate with clarity its views with respect to COVA and the judges of the court. As a matter of record, the DAV "enthusiastically supported the nominations of the sitting judges. And we continue to support them," he noted.

"The implication...that my former government service somehow, in some unspecified way, has impinged upon my ability to honor my oath and to conduct independent judicial review is wholly without foundation," the judge wrote.

The DAV wishes to clarify that it was not our intent, as Judge Farley inferred, to suggest that the government controls the decisions handed down by the court. The DAV has every confidence in the court's independence.

Pointing out that all the current judges have extensive government backgrounds in no way implies that the DAV believes the court to be biased. "This is not meant to suggest that merely because a lawyer's experience is mainly, or even exclusively, in government practice [that it] detracts from his or her suitability to serve on the court," Mr. Gorman said.

When the current COVA judges were chosen in 1989 and 1990, there was no pool of qualified veterans' advocates from which potential judges could be selected. Since then, however, more than 1,200 lawyers have joined the court's bar. A number of them have distinguished themselves in the area of veterans' law and have demonstrated their qualifications to serve on the court.

"We intended the article to focus on the selection of future judges. And be assured, DAV would be intolerable of any type of bias existing in the future," Mr. Gorman said.

Further, it was not the intent of the DAV to mislead or imply to our readers that the court's decisions have been unfair or biased in any way. It was our intention to participate in the political process of selecting judges of the court by expressing our view of the qualities we believe those judges should possess. More than any other group of lawyers, those who specialize in veterans' law have been instrumental in the evolution of case law for the court, as well as its rules and procedures.

"The DAV is well aware and appreciative of the many fine lawyers who have dedicated their professional careers to government service," Mr. Gorman assured Judge Farley.

"DAV did not intend its magazine article to reflect on the nominations, confirmations, or qualifications of the sitting judges," Mr. Gorman stressed. "We intended to influence the nomination of future judges in a way which would benefit all parties, the court, the government, and the veterans community." ■

DAVID W. GORMAN
EXECUTIVE DIRECTOR
ASHINGTON HEADQUARTERS

PHONE: 554-3501
AREA CODE 202

May 7, 1997

The Honorable Frank Q. Nebeker
Chief Judge
United States Court of Veterans APPEALS
625 Indiana Ave., N.W., Suite 900
Washington, DC 20004

Dear Chief Judge Nebeker:

I have been asked by National Commander Gregory C. Reed to reply to your letter of April 18, 1997 regarding your continuing concern about the article in the March/April *DAV Magazine* focusing on the court.

As I wrote in my April 15, 1997 letter to you, DAV recognizes the subject article could lead different readers to varying conclusions. Therefore, we acknowledged the need to publish a clarification in the May/June issue of *DAV Magazine*. This has been accomplished and I am attaching a copy of the clarification for your use.

While I recognize your concern and that which prompted Judge Farley to originally write, I am satisfied the DAV has responded to those concerns.

Sincerely,

David W. Gorman
Executive Director, Washington Headquarters