Citation Nr: 1443686 
Decision Date: 09/30/14 Archive Date: 10/06/14

DOCKET NO. 07-33 612 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Montgomery, Alabama


THE ISSUES

1. Entitlement to service connection for a breathing disorder (claimed as a lung condition and shortness of breath with chronic obstructive pulmonary disease (COPD)).

2. Entitlement to an initial disability rating in excess of 30 percent for service-connected coronary artery disease (CAD).

3. Entitlement to an initial disability rating in excess of 20 percent for service-connected type II diabetes mellitus prior to March 6, 2014, and a 40 percent rating beginning from March 6, 2014. 

4. Entitlement to an initial evaluation in excess of 10 percent for peripheral neuropathy of the right lower extremity associated with diabetes mellitus. 

5. Entitlement to an initial compensable evaluation for peripheral neuropathy, anterior crural nerve, right lower extremity, prior to March 6, 2014, and an evaluation in excess of 10 percent beginning March 6, 2014. 


6. Entitlement to an initial evaluation in excess of 10 percent for peripheral neuropathy of the left lower extremity associated with diabetes mellitus. 

7. Entitlement to an initial compensable evaluation for peripheral neuropathy, anterior crural nerve, left lower extremity, prior to March 6, 2014, and an evaluation in excess of 10 percent beginning March 6, 2014.

8. Entitlement to a separate compensable rating for diabetic foot ulcers. 

9. Entitlement to a separate compensable rating for erectile dysfunction secondary to diabetes mellitus. 

10. Entitlement to an extraschedular rating based on an individual or combined disability basis. 

11. Entitlement to a total disability rating based on individual unemployability due to service-connected disability (TDIU).


REPRESENTATION

Appellant represented by: The American Legion


WITNESS AT HEARING ON APPEAL

The Veteran


ATTORNEY FOR THE BOARD

C. Bosely, Counsel


INTRODUCTION

The Veteran served on active duty from April 1968 to March 1971. He was awarded the Purple Heart Medal.

These matters originally came to the Board of Veterans' Appeals (Board) on appeal from December 2005 and June 2008 rating decisions by Department of Veterans Affairs (VA) Regional Offices (RO). In April 2010, the Veteran testified at a hearing before the undersigned. In July 2010 and January 2014, the Board remanded the appeal for further development.

By a May 2014 rating decision, the agency of original jurisdiction (AOJ) granted service connection for peripheral neuropathy, anterior crural nerve, right lower extremity and left lower extremity, assigning each disability a separate disability evaluation of 10 percent effective March 6, 2014. Because the rating schedule directs that compensable complications of diabetes are to be evaluated separately, these issues are included within the scope of this appeal. See 38 C.F.R. § 4.119 diagnostic code (DC) 7913 (2013). 

By a different May 2014 rating decision, a 40 percent disability evidence was assigned for the Veteran's diabetes mellitus, effective March 6, 2014. 

The issue of entitlement to a TDIU has been raised as a component of the initial disability rating claims on appeal. Thus, it is presently in appellate status before the Board. See Rice v. Shinseki, 22 Vet. App. 447 (2009). 

The issues of (1) entitlement to a separate compensable rating for diabetic foot ulcers; (2) entitlement to a separate compensable rating for erectile dysfunction secondary to diabetes mellitus; (3) entitlement to an extraschedular rating based on an individual or combined disability basis; and (4) entitlement to a TDIU are addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. The most probative evidence of record makes it most likely that the Veteran's COPD is solely a result of tobacco use rather than any event or injury of service or a service-connected disability.

2. The most probative evidence of record shows that the Veteran's coronary artery disease is manifested throughout the period of appellate review by more than one episode of acute congestive heart failure in any one year, or; workload of greater than 3 METs but not greater than 5 METs results in dyspnea, fatigue, angina, dizziness, or syncope, or; left ventricular dysfunction with an ejection fraction of 30 to 50 percent.

3. The most probative evidence of record shows that the Veteran's type II diabetes mellitus is manifested throughout the period of appellate review by required insulin, restricted diet, and regulation of activities, but not a higher disability level. 

4. The most probative evidence of record shows that the Veteran's peripheral neuropathy of the right lower extremity is manifested throughout the period of appellate review by a moderate, but not moderately severe, level of disability. 

5. The most probative evidence of record shows that the Veteran's peripheral neuropathy, anterior crural nerve, of the right lower extremity is manifested throughout the period of appellate review by a moderate, but not moderately severe, level of disability. 

6. The most probative evidence of record shows that the Veteran's peripheral neuropathy of the left lower extremity is manifested throughout the period of appellate review by a moderate, but not moderately severe, level of disability. 

7. The most probative evidence of record shows that the Veteran's peripheral neuropathy, anterior crural nerve, of the left lower extremity is manifested throughout the period of appellate review by a moderate, but not moderately severe, level of disability. 


CONCLUSIONS OF LAW

1. The criteria to establish service connection for COPD are not met. 38 U.S.C.A. §§ 1101, 1110, 1103, 5103, 5103A, 5107 (West 2002); 38 C.F.R. § 3.310 (2006); 38 C.F.R. §§ 3.102, 3.159, 3.300, 3.303, 3.304, 3.307, 3.309 (2013).

2. The criteria for the assignment of an initial disability rating in excess of 30 percent for coronary artery disease are not met throughout the period of appellate review. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 4.1, 4.2, 4.3, 4.7, 4.105, DC 7005 (2013).

3. The criteria for the assignment of an initial 40 percent disability rating, but not more, for type II diabetes mellitus are met throughout the period of appellate review. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 4.1, 4.2, 4.3, 4.7, 4.119, including Diagnostic Code 7913(2013). 

4. The criteria for the assignment of an initial disability rating in excess of 10 percent for peripheral neuropathy of the right lower extremity are not met throughout the period of appellate review. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 4.1, 4.2, 4.3, 4.7, 4.124a, including Diagnostic Codes 8520, 8526 (2013). 

5. The criteria for the assignment of an initial 10 percent rating, but not higher, for peripheral neuropathy, anterior crural nerve, of the right lower extremity are met throughout the period of appellate review. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 4.1, 4.2, 4.3, 4.7, 4.124a, including Diagnostic Codes 8520, 8526 (2013). 

6. The criteria for the assignment of an initial disability rating in excess of 10 percent for peripheral neuropathy of the left lower extremity are not met throughout the period of appellate review. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 4.1, 4.2, 4.3, 4.7, 4.124a, including Diagnostic Codes 8520, 8526 (2013). 

7. The criteria for the assignment of an initial 10 percent rating, but not higher, for peripheral neuropathy, anterior crural nerve, of the left lower extremity are met throughout the period of appellate review. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 4.1, 4.2, 4.3, 4.7, 4.124a, including Diagnostic Codes 8520, 8526 (2013). 


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Duties to Notify and Assist

A. Duty to Notify

VA has a duty to notify a claimant as to the information and evidence necessary to substantiate a claim for VA benefits. See Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). 

As to the service connection claim, the Veteran was sent Veterans Claims Assistance Act of 2000 (VCAA), Pub. L. No. 106-475, 114 Stat. 2096 (2000), letters in June 2005, December 2007, July 2008, and February 2014. The December 2007 and July 2008 letters, while not specifically listing the claimed respiratory disorder, informed the Veteran how service connection is established on a secondary basis. The Board finds that these letters reasonably informed the Veteran of the necessary information. While the Veteran may not have been provided with adequate notice before the claim was adjudicated, the Board finds that providing him with adequate notice in the above letters followed by a readjudication of the claim in the May 2014 supplemental statement of the case (SSOC) "cures" any timing problem associated with inadequate notice or the lack of notice prior to the initial adjudication. Mayfield v. Nicholson, 20 Vet. App. 537 (2006) (Mayfield III), citing Mayfield II, 444 F.3d at 1333-34. Therefore, the duty is satisfied.

As to the rating claims the Veteran is challenging the initial evaluations assigned following the grant of service connection for the disability. In Dingess/Hartman, the Court also held that in cases where service connection has been granted and initial disability evaluations have been assigned, the service connection claims have been more than substantiated, they have been proven, thereby rendering § 5103(a) notice no longer required because the purpose that the notice is intended to serve has been fulfilled. Dingess, 19 Vet. App. at 490-91; see also Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112 (2007). 

As to all the issue on appeal, the Board finds that even if VA had an obligation to provide additional notice under 38 U.S.C.A. § 5103(a) and failed to do so, this notice problem does not constitute prejudicial error in this case because the record reflects that a reasonable person could be expected to understand what was needed to substantiate the claims after reading the rating decision, the statement of the case, the supplemental statements of the case, and the Board remands. See Shinseki v. Sanders, 129 S.Ct. 1696 (2009). 

B. Duty to Assist

The VCAA also requires VA to make reasonable efforts to help a claimant obtain evidence necessary to substantiate the claims. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159(c)(d). VA will help a claimant obtain records relevant to the claim(s) whether or not the records are in Federal custody, and VA will provide a medical examination and/or opinion when necessary to make a decision on the claim. 38 C.F.R. § 3.159(c)(4).

1. Duty to Obtain Records

VA has met the duty to assist the Veteran in the development of the claims being decided herein because his service treatment records have been obtained and appear to be complete. Also, VA obtained VA and private treatment records, plus records from the Social Security Administration (SSA) in connection with the Veteran's claim for benefits with that agency. Where any private medical records were not directly obtained by VA, the SSA file contains comprehensive private medical records, plus that agency's own medical evaluations. 

2. Duty to Provide Examination/Opinion

The Veteran has undergone numerous VA examinations in connection with this appeal, most recently in April 2014. The Board finds that the April 2014 VA examination is adequate to decide the appeal. The examiner reviewed the claims file, including the service treatment records, examined the Veteran and reported relevant clinical findings, and provided medical findings directly pertinent to the instant medical questions raised in this appeal. See McLendon v. Nicholson, 20 Vet. App. 79 (2006); 38 U.S.C.A. § 5103A(d)(2) (West 2002). Because the evidence of record is otherwise adequate to fully resolve the matter, no further VA examination is necessary. See 38 C.F.R. § 3.159(c)(4) (2013). To the extent the Board is remanding several claims for new VA examinations, the April 2014 VA examination remains adequate to decide those issues addressed immediately below. 

3. Bryant notice

As noted above, VA provided the Veteran with a hearing before the Board. In Bryant v. Shinseki, 23 Vet. App. 488 (2010), the United States Court of Appeals for Veterans Claims (Court) held that 38 C.F.R. § 3.103(c)(2) requires that the Veterans Law Judge who conducts a hearing fulfill two duties to comply with the above the regulation. These duties consist of (1) the duty to fully explain the issues and (2) the duty to suggest the submission of evidence that may have been overlooked. 

Here, during the hearing, the undersigned discussed with the Veteran and his representative the issues involved, including the requirements for establishing service connection and higher disability ratings. See Board Hr'g Tr. 25, 27, 28-29. The undersigned and the Veteran's counsel also explored the question of whether additional evidence favorable to the appeal remained outstanding. See, e.g., Board Hr'g Tr. 2, 38-39, 42. The Board concludes it met all the requirements described in 38 C.F.R. § 3.103(c)(2) and Bryant.

C. Stegall Compliance

The Board also finds that there was substantial compliance with the January 2014 Board remand directives. Specifically, the Veteran was sent a notice letter upon remand in February 2014 requesting that he identify all pertinent medical treatment providers who may have additional records. (The Veteran's representative stated in May 2014 indicating that they had no additional evidence regarding the appeal.) Next, as directed, the Veteran underwent a VA examination in April 2014 to address the medically complex questions raised in this appeal. Finally, the matter was readjudicated in a May 2014 SSOC, as directed by the Board. Accordingly, there was substantial compliance with the prior Board remand directives, and no further remand is necessary. See Stegall v. West, 11 Vet. App. 268 (1998); see D'Aries v. Peake, 22 Vet. App. 97, 104-05 (2008).

For the above reasons, the Board finds the duties to notify and assist have been met, all due process concerns have been satisfied, and the appeal may be considered on the merits at this time.

In adjudicating the claim below, the Board has reviewed all of the evidence in the Veteran's Virtual VA and VBMS claims files. Although the Board has an obligation to provide adequate reasons and bases supporting this decision, there is no requirement that all the evidence submitted by the Veteran or obtained on his behalf be discussed in detail. Rather, the Board's analysis below will focus specifically on what evidence is needed to substantiate the claims and what the evidence in the claims files shows, or fails to show, with respect to the claims. See Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000); Timberlake v. Gober, 14 Vet. App. 122, 128-30 (2000).


II. Analysis

A. Service Connection

The Veteran maintains that he has a breathing disorder due to service, including Agent Orange exposure, or a service-connected disability. The evidence of record, however, makes such a relationship unlikely.

In this regard, service connection is warranted where the evidence of record establishes that a particular injury or disease resulting in disability was incurred in the line of duty in the active military service or, if pre-existing such service, was aggravated thereby. 38 U.S.C.A. § 1110; 38 C.F.R. § 3.303. If a condition noted during service is not shown to be chronic, then generally a showing of continuity of symptomatology after service is required for service connection if the disability is one that is listed in 38 C.F.R. § 3.309(a). 38 C.F.R. § 3.303(b); See also Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013). Other specifically enumerated disorders will be presumed to have been incurred in service if they manifested to a compensable degree within the first year following separation from active duty. 38 U.S.C.A. §§ 1101, 1112, 1113 (West 2002); 38 C.F.R. §§ 3.307, 3.309 (2013). 

Service connection may also be granted where disability is proximately due to or the result of already service-connected disability. 38 C.F.R. § 3.310. Compensation is payable when service-connected disability has aggravated a non-service-connected disorder. Allen v. Brown, 7 Vet. App. 439 (1995) (en banc).

There was an amendment to the provisions of 38 C.F.R. § 3.310. See 71 Fed. Reg. 52744-47 (Sept. 7, 2006). The amendment sets a standard by which a claim based on aggravation of a non-service-connected disability by a service-connected one is judged. Although VA has indicated that the purpose of the regulation was merely to apply the Court's ruling in Allen, it was made clear in the comments to the regulation that the changes were intended to place a burden on the claimant to establish a pre-aggravation baseline level of disability for the non-service-connected disability before an award of service connection based on aggravation may be made. This had not been VA's practice, which suggests the possibility that the recent change amounts to a substantive change in the regulation. For this reason, and because the Veteran's claim was pending before the regulatory change was made, the Board will consider the version of 38 C.F.R. § 3.310 in effect before the change, which is more favorable to the claimant.

With regard to herbicide exposure, VA laws and regulations provide that a Veteran who, during active military, naval, or air service, served in the Republic of Vietnam during the Vietnam war (i.e., January 9, 1962, to May 7, 1975), shall be presumed to have been exposed to an herbicide agent, unless there is affirmative evidence to the contrary. 38 U.S.C.A. § 1116(a)(3); 38 C.F.R. § 3.307(a)(6)(iii). The last date on which such a Veteran shall be presumed to have been exposed to an herbicide agent shall be the last date on which he served in the Republic of Vietnam during the Vietnam war period. 38 C.F.R. § 3.307. For these Veterans, diseases associated with exposure to certain herbicide agents will be presumed to have been incurred in service even though there is no evidence of that disease during the period of service at issue. 38 U.S.C.A. § 1116; 38 C.F.R. §§ 3.307, 3.309. 

The list of diseases associated with exposure to certain herbicide agents is as follows: AL amyloidosis; chloracne or other acneform disease consistent with chloracne; Type 2 diabetes (also known as Type II diabetes mellitus or adult-onset diabetes); Hodgkin's disease; Ischemic heart disease; all chronic B cell leukemias; multiple myeloma; non-Hodgkin's lymphoma; Parkinson's disease; acute and subacute peripheral neuropathy; porphyria cutanea tarda; prostate cancer; respiratory cancers (cancer of the lung, bronchus, larynx, or trachea); and soft-tissue sarcoma (other than osteosarcoma, chondrosarcoma, Kaposi's sarcoma, or mesothelioma). 38 C.F.R. § 3.309(e).

The availability of presumptive service connection for a disability based on exposure to herbicides does not preclude a Veteran from establishing service connection with proof of direct causation. Stefl v. Nicholson, 21 Vet. App. 120 (2007); see also Combee v. Brown, 34 F.3d 1039 (Fed. Cir. 1994).

In evaluating the evidence in any given appeal, it is the responsibility of the Board to weigh the evidence and decide where to give credit and where to withhold the same and, in so doing, accept certain medical opinions over others. Schoolman v. West, 12 Vet. App. 307, 310-11 (1999). In this regard, the Board has been charged with the duty to assess the credibility and weight given to evidence. Davidson v. Shinseki, 581 F. 3d 1313 (Fed. Cir. 2009); Jandreau v. Nicholson, 492 F. 3d 1372 (Fed. Cir. 2007); Buchanan v. Nicholson, 451 F. 3d 1331 (Fed. Cir. 2006); Charles v. Principi, 16 Vet. App. 370 (2002); Klekar v. West, 12 Vet. App. 503, 507 (1999); Wood v. Derwinski, 1 Vet. App. 190, 193 (1991). Indeed, the Court has declared that in adjudicating a claim, the Board has the responsibility to do so. Bryan v. West, 13 Vet. App. 482, 488-89 (2000); Wilson v. Derwinski, 2 Vet. App. 614, 618 (1992). In doing so, the Board is free to favor one medical opinion over another, provided it offers an adequate basis for doing so. Evans v. West, 12 Vet. App. 22, 30 (1998); Owens v. Brown, 7 Vet. App. 429, 433 (1995). 

(1) Existence of a Present Disability

A private pulmonary function test (PFT) from October 2006 shows a diagnosis of COPD. This diagnosis was confirmed most recently on VA examination in March 2013. Accordingly, the threshold requirement, a current disability, is established. 

(2) In-Service Incurrence or Aggravation of a Disease or Injury

The Veteran's service treatment records (STRs) show no indication of in-service disease or injury. To the contrary, in relevant part, a "routine chest" X-ray was conducted in December 1970, and it states that he "has no history of lung disease." The test revealed no abnormality. On physical examination at separation in January 1972, clinical evaluation of the lungs and chest was likewise found "normal," and a chest X-ray again showed no abnormality. However, the Veteran served in Vietnam from March 1971 to January 1972. Accordingly, Agent Orange exposure, which is an in-service injury, is presumed. See 38 C.F.R. § 3.307. 

With regard to the theory of secondary service connection, the Veteran testified at his Board hearing that his private doctor told him he had lung disease associated with a heart condition. Board Hr'g Tr. 29. He is service-connected for CAD. 

(3) Nexus

In light of the above two findings, the remaining question concerns the nexus element. After careful consideration, the Board must find that the evidentiary record makes it unlikely that a nexus exists on any theory of entitlement, which the Board will address separately.

Direct - Agent Orange

COPD is not a disease listed in 38 C.F.R. § 3.309(e), which establishes the diseases associated with exposure to Agent Orange. Accordingly, service connection cannot be established on a presumptive basis. 

According to the National Academy of Science, Veterans and Agent Orange:
Update 2012: 

Consistent with its findings in Update 2010, NAS in Update 2012, found inadequate or insufficient evidence to determine whether an association exists between herbicide exposure and the following conditions: (19) respiratory disorders (wheeze or asthma, chronic obstructive pulmonary disease, and farmer's lung)

See 79 Fed. Reg. 20308, 20312 (April 11, 2014). This finding that there is "inadequate or insufficient evidence to determine whether an association exists" is too speculative to support a grant of service connection for COPD because:

NAS has defined this category of association to mean that available epidemiologic studies are of insufficient quality, consistency, or statistical power to permit a conclusion regarding the presence or absence of an association. For example, these studies may fail to control for confounding factors, have inadequate exposure assessment, or fail to address latency.

Id. (emphasis added). In light of this explanation, the Board must find that the NAS study does not increase the likelihood that the Veteran's COPD is (or is not) a result of his Agent Orange exposure. Granting on the basis of this NAS study would be on the basis of pure speculation or remote possibility, which does not present an actual conflict or a contradiction in the evidence, warranting application of the reasonable doubt doctrine. See 38 C.F.R. § 3.102. This NAS study, in other words, is neither positive evidence weighing in favor of the claim nor negative evidence weighing against the claim. 

A March 2014 VA examiner addressed the Agent Orange theory and concluded that "[a] diagnosed breathing disorder has not been recognized by the VA as [due to] exposure to Agent Orange." The Board finds that this opinion is non-determinative, as the VA examiner is essentially saying that the Veteran's COPD is not due to Agent Orange because it is not on the presumptive list. Much more compelling, however, the March 2014 VA examiner, as explained in greater detail herein below, ultimately concluded that the Veteran's COPD is most likely due to his smoking, which is "the leading cause of COPD." This opinion makes it, by inference, much less likely that his COPD is due to Agent Orange exposure. 

Accordingly, the evidentiary record makes it very unlikely that the Veteran's COPD is due to Agent Orange exposure. The evidence is not in approximate balance on this theory of entitlement. 

Direct (Other) and Secondary

The evidentiary record is also not in approximate balance on either the direct or secondary theories of entitlement. 

The Board observes that COPD is not a chronic disease listed in 38 C.F.R. § 3.309(a). Thus, chronicity and continuity of symptomatology are not for consideration here. Walker, 708 F.3d 1331.

Otherwise, as indicated, the Veteran underwent a VA examination in March 2014. This examiner reviewed the matter and determined that the Veteran's COPD was not at least as likely as not (i.e., a fifty percent or greater probability) caused by his military service (including his confirmed exposure to herbicides while serving in the Republic of Vietnam or) has continued since that time. The examiner explained that "[t]he c-file review does not reveal a respiratory diagnosis while in service or its treatment." The examiner also determined it was not at least as likely as not (i.e., a fifty percent or greater probability) that it was caused or aggravated by a service connected disability including his type 2 diabetes mellitus and/or coronary artery disease. Rather, the VA examiner determined, "[t]he [V]eteran's mild COPD is at least likely as not caused by history of 50 pack years until 2000, greater than 35 years." The examiner reasoned that, according to the National Institute of Health, smoking is the leading cause of COPD. Also, according to the VA examiner, the Veteran was shown to complain of shortness of breath prior to his heart disease, and there is no evidence shown the diabetes or CAD caused or aggravated his lung disease.

Again, the March 2014 VA examiner's assessment is that the Veteran's COPD is "at least as likely as not caused by" his history of smoking. Taken in isolation, this opinion might indicate that the condition is equally likely due to smoking or some other factor(s), such as an in-service injury or a service-connected disability. However, the VA examiner otherwise gave his opinion that it is "not at least as likely as not," i.e., less likely, that a positive association exists between an in-service injury or a service-connected disease. Therefore, when read overall, the VA examiner's opinion must reasonably be understood to mean that the Veteran's COPD is (a) most likely due to smoking, and (b) unlikely due to an in-service injury, or caused by or aggravated by a service-connected disability. See Acevedo v. Shinseki, 25 Vet. App. 286 , 293-94 (2012); see also Monzingo v. Shinseki, 26 Vet. App. 97, 107 (2012) (an examination report "must be read as a whole" to determine the examiner's rationale). 

This need to interpret the March 2014 VA examiner's opinion tends to reduce the weight of the opinion somewhat. It does not materially diminish the overall strength of the opinion, however, which is otherwise factually accurate, comprehensive, and sufficiently supported. Accordingly, it is highly probative, and its great evidentiary weight makes a direct or secondary relationship unlikely in this case. See Nieves-Rodriguez, 22 Vet. App. at 304; Monzingo, 26 Vet. App. at 107.

The Veteran also underwent a VA examination in August 2010. The Board in its January 2014 remand found this examination inadequate to fully resolve the claim because the examiner did not conduct a pulmonary function test, and the examiner did not discuss the medical evidence found in the claims file that indicates the Veteran had a current diagnosis of COPD. The Board finds no reason to revisit its preliminary assessment of the examination as the evidence developed subsequent to the January 2014 remand does not rehabilitate the August 2010 VA examination. 

Aside from this evidence, the Board has carefully considered the Veteran's own Board hearing testimony where he indicated that his private doctor associated his COPD with his heart condition. The Veteran similarly wrote in support of the claim in May 2010 that his private doctors "seem to feel this shortness of breath could be related to heart due to angina and dyspnea." 

Consistent with the Veteran's statements, he went to his private doctor in April 2010, which was one month prior to his May 2010 statement. The doctor wrote that he had "complaints of increasing shortness of breath that occurs with exertion. I feel at this time that his symptoms are consistent with that of angina." Later in April 2010, after a cardiac workup, this same doctor gave an assessment of "Dyspnea. Etiology of this is unclear. Could be possibly secondary to COPD or possible interstitial lung disease." 

This sequence of events makes it most likely that the Veteran complained of shortness of breath to his doctors, who thought it might be a symptom of heart disease. These doctors' notes do not indicate that the Veteran's COPD is the result of or aggravated by CAD. To the contrary, the private doctor's later note in April 2010 concludes with the following: "If this is all negative would consider a CT scan of the chest to evaluate the increased interstitial markings on his chest X-ray. This is most likely just scarring but due to his history of toxic exposures it could be possible interstitial lung disease." Because the only "toxic exposures" noted in this doctor's treatment records is smoking, the doctor's notes actually tend to support the March 2014 VA examiner's assessment that the Veteran's COPD is most likely due to his history of smoking. Accordingly, the Veteran's testimony reflects a reasonable lay person's misunderstanding of his private doctors' consultations. 

Otherwise, the Veteran testified at his Board hearing that he had never asked his doctors if his COPD was caused or made worse by CAD or diabetes, so they had never given him such an opinion, and no doctor had told him it is due to his military service. 

Aside from this testimony, the Board noes that it is common knowledge that smoking is a leading cause of COPD. In fact, a private treatment record from September 2006 notes the Veteran's history of smoking followed by his concern that "maybe his emphysema or chronic lung disease may be catching up with him." Accordingly, it was apparent to the Veteran at that time that his history of tobacco use may be a cause of his lung diagnosis. 

More generally, however, the nature of COPD, the difficulty shown in reaching the diagnosis, plus the multiple potential causes for the disorder, including the issue of whether his specific COPD was caused by his service or caused/aggravated by a service-connected disability, is too complex to be within the common knowledge of a non-expert lay person such as the Veteran or the Board. Accordingly, the lay evidence is not competent, and the Board must defer to the expert medical evidence of record, which makes it most likely that the condition is a result of the Veteran's tobacco use. See Davidson, supra; Black v. Brown, 10 Vet. App. 297, 284 (1997) (in evaluating the probative value of medical statements, the Board looks at factors such as the individual knowledge and skill in analyzing the medical data).

Overall, with careful consideration of the relative probative value of the unfavorable evidence, which is considerable, with that of the favorable evidence, which is minimal, the more probative evidence shows that the Veteran's COPD is most likely the result of smoking and is unlikely due to Agent Orange or any other event or injury of his activity service or a service-connected disability. See Owens v. Brown, 7 Vet. App. 429, 433 (1995) (holding that VA may favor the opinion of one competent medical expert over that of another when decision makers give an adequate statement of reasons and bases); Guerrieri v. Brown, 4 Vet. App. 467, 473 (1993) ("the probative value of medical opinion evidence is based on the medical expert's personal examination of the patient, the physician's knowledge and skill in analyzing the data, and the medical conclusion the physician reaches.... As is true with any piece of evidence, the credibility and weight to be attached to these opinions [are] within the province of the [Board as] adjudicators. . ."). There is no indication that the disability can be service-connected on some basis other than the Veteran's use of tobacco products during service. See 38 C.F.R. § 3.300(b)(2). 

Because a disease may not be service-connected on the basis of tobacco use, even if that tobacco use occurred during service, the preponderance of the probative evidence in this case weighs against the claim of service connection for COPD, and the claim must be denied. See 38 U.S.C.A. § 1103; 38 C.F.R. 3.300. 

In reaching this conclusion, the Board has considered the applicability of the benefit-of-the-doubt doctrine. However, that doctrine is not applicable where, as here, there is not an approximate balance of positive and negative evidence on all material issues of fact and law. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Fagan, 573 F.3d at 1287 (quoting 38 U.S.C. § 5107(b)).

B. Higher Evaluations

1. CAD

The Veteran's CAD has been assigned an initial 30 percent disability rating. 

The schedule for rating diabetes is located under 38 C.F.R. § 4.105. The rating schedule is as follows:

7005 Arteriosclerotic heart disease (Coronary artery disease):

With documented coronary artery disease resulting in:

Chronic congestive heart failure, or; workload of 3 METs or less results in dyspnea, fatigue, angina, dizziness, or syncope, or; left ventricular dysfunction with an ejection fraction of less than 30 percent
100 
More than one episode of acute congestive heart failure in the past year, or; workload of greater than 3 METs but not greater than 5 METs results in dyspnea, fatigue, angina, dizziness, or syncope, or; left ventricular dysfunction with an ejection fraction of 30 to 50 percent
60 
Workload of greater than 5 METs but not greater than 7 METs results in dyspnea, fatigue, angina, dizziness, or syncope, or; evidence of cardiac hypertrophy or dilatation on electrocardiogram, echocardiogram, or X-ray
30 
Workload of greater than 7 METs but not greater than 10 METs results in dyspnea, fatigue, angina, dizziness, or syncope, or; continuous medication required
10
Note: If nonservice-connected arteriosclerotic heart disease is superimposed on service-connected valvular or other non-arteriosclerotic heart disease, request a medical opinion as to which condition is causing the current signs and symptoms.


One MET (metabolic equivalent) is the energy cost of standing quietly at rest and represents an oxygen uptake of 3.5 milliliters per kilogram of body weight per minute. When the level of METs at which dyspnea, fatigue, angina, dizziness, or syncope develops is required for evaluation, and a laboratory determination of METs by exercise testing cannot be done for medical reasons, an estimation by a medical examiner of the level of activity (expressed in METs and supported by specific examples, such as slow stair climbing or shoveling snow) that results in dyspnea, fatigue, angina, dizziness, or syncope may be used. 38 C.F.R. § 4.105, Introductory Note (2).

Whether or not cardiac hypertrophy or dilatation (documented by electrocardiogram, echocardiogram, or X-ray) is present and whether or not there is a need for continuous medication must be ascertained in all cases. Even if the requirement for a 10 percent (based on the need for continuous medication) or 30 percent (based on the presence of cardiac hypertrophy or dilatation) evaluation is met, METs testing is required in all cases except: (1) When there is a medical contraindication; (2) When the left ventricular ejection fraction has been measured and is 50% or less; (3) When chronic congestive heart failure is present or there has been more than one episode of congestive heart failure within the past year; (4) When a 100% evaluation can be assigned on another basis. If left ventricular ejection fraction (LVEF) testing is not of record, the evaluation is to be based on the alternative criteria unless the examiner states that the LVEF test is needed in a particular case because the available medical information does not sufficiently reflect the severity of the veteran's cardiovascular disability. See 38 C.F.R. § 4.100(a)-(c). 

In the instant case, the schedular requirements for a rating higher than 30 percent are not met. 

Acute Congestive Heart Failure

First, the evidence does not show more than one episode of acute congestive heart failure in any one year. VA examiners in August 2011 and April 2014 report that the Veteran had no history of congestive heart failure. These assessment are consistent with the VA and private medical records, which do not indicate congestive heart failure. See Bloom v. West, 12 Vet. App. 185, 187 (1999) (the probative value of a physician's statement is dependent, in part, upon the extent to which it reflects "clinical data or other rationale to support his opinion."). Such a significant condition is reasonably expected to be documented in some manner in these records if it existed. Because it is not, the silence in the record can be taken as evidence indicating that the condition is absent. See Buczynski v. Shinseki, 24 Vet. App. 221, 224 (2011); see also AZ v. Shinseki, 731 F.3d 1303 (Fed. Cir. 2013).

METS

Next, the evidence does not show a workload of greater than 3 METs but not greater than 5 METs resulting in dyspnea, fatigue, angina, dizziness, or syncope. 

A VA examination was conducted most recently in April 2014. The VA examiner found that the Veteran had dyspnea, fatigue, and dizziness, which resulted in a METs level of greater than 5 to 7 METs. This METs level was found to be consistent with activities such as walking 1 flight of stairs, golfing (without cart), mowing lawn (push mower), heavy yard work (digging). The VA examiner explained that the METs level was not a limitation due solely to the heart condition; rather it is due to multiple factors, including COPD; but, the examiner concluded that it is not possible to accurately estimate this percentage. 

The Board notes that this is the only METs level given throughout the period of appellate review. The Veteran previously underwent a VA examination in August 2011, but a VA examiner wrote in March 2012 that METs could not be accurately estimated because the symptoms that he reported at the examination were inconsistent with the objective evidence on echocardiogram, and the DBQ heart remarks section clearly stated that his Reported symptoms were "non cardiac." The examiner agreed with an earlier assessment that the Veteran's normal ejection fraction, an objective assessment of cardiac function, is the best reflection of his cardiac status. The examiner also explained that cardiology medical records in the claims file documented successful surgery (PTCA) of his heart (LAD). The examiner found that the Veteran was inactive by choice, and objective cardiac evidence indicated to the examiner that it was more likely than not that the Veteran was capable of physical activity at the 7-10 METs level if he so chose. 

The Board remanded this matter in January 2014 based, in part, on a determination that the VA examinations were incomplete because METs testing was not conducted and the examiner did not state that METs testing was contraindicated and none of these other factors were present. The Board sees no reason to now change its preliminary assessment of this examination in that regard. Nonetheless, the August 2011 and March 2012 examinations make it appear likely that the Veteran's functional impairment is not a result of his CAD

Ultimately, however, the Board must rely on the April 2014 VA examiner's assessment as it is most consistent with the remaining of record. See Colvin v. Derwinski, 1 Vet. App. 171, 175 (1991) (VA may only consider independent medical evidence to support its findings and is not permitted to base decisions on its own unsubstantiated medical conclusions). For instance, at his April 2010 VA examination the Veteran testified that he could probably walk 100 feet, and he could do yard work, such as raking, but would have to rake a little bit and then go sit down. See Hr'g Tr. 25, 27. The Board notes that this level of physical activity was more or less constant throughout the period of appellate review. For instant, he reported to his private doctor in September 2006 that his ability to do activities and exercise had dropped off somewhat rapidly over the past month. Again at his private doctor in January 2007, he complained that he had been having difficulty with lightheadedness whenever he exerted himself to the point that he felt he would pass out at times." But when he went to VA in April 2008 and again in December 2009, he reported working in his yard. In February 2009, he was "exercise[ing] 3 days per week." By December 2011, he was walking with is cane every day for 30 minutes. In March 2012, he walked 1 block every day. In January 2013, he reported exercising depending on the weather, including walks. In August 2013 and December 2013, he was still walking and working in the garden, but had to sit in a chair to do so. 

In light of this record, particularly the April 2014 VA examiner's assessment, which is reasonably supported by the remaining evidence of record, the Board finds that the most probative evidence of record shows that the Veteran's CAD is not manifested by a workload of greater than 3 METs but not greater than 5 METs, even if there is some evidence of dyspnea, fatigue, dizziness, and syncope. 

Left Ventricular Dysfunction

The evidence of record does not show that the Veteran's disability involves an ejection fraction of 30 to 50 percent. 

The record before the Board includes the results of two echocardiograms during the period of appellate review. The first, conducted in October 2006, and it showed an LVEF of 51 percent. The second, conducted in June 2013 and noted by the April 2014 VA examiner, showed LVEF of greater than 65 percent. 

The October 2006 ejection fraction, which was the lower of the two results, was greater than 50 percent. Accordingly, an ejection fraction of 0 to 50 percent is not shown. 
 
History of Myocardial Infarction

As a final matter, the Board wishes to take notice, as best summarized by the April 2014 VA examiner, that the Veteran had myocardial infarctions in October 2006, and "several heart Cath's over the years."

Myocardial infarction (MI) is a separate heart condition from CAD as indicated by the rating schedule which lists them under separate diagnostic codes. See 38 C.F.R. § 4.115, DCs 7005 and 7006. Here, the Veteran has not been granted service connection for his MIs. To this extent, apart from the hospitalizations for his MIs, the evidentiary record does not distinguish the degree of impairment attributable to each condition. Accordingly, the Board has not attempted to do so; all his heart symptomatology has been considered a part of the service-connected CAD. See Mittleider v. West, 11 Vet. App. 181, 182 (1998). Ultimately, however, the Veteran does not appear to be prejudice by the nonservice-connected status of his MIs. In this regard, the diagnostic criteria are the same for each condition, except that DC 7006, regarding MI, provides for a total (100 percent) schedular rating during and for three months following myocardial infarction, documented by laboratory tests. See 38 C.F.R. § 4.115. 

The Veteran's last MI occurred in October 2006, which was well prior to the period of appellate review now before the Board for the Veteran's CAD. Even giving him full consideration, a three month period following October 2006 would be approximately January 2007. The instant period of appellate review begins in November 2007. Thus, the two time periods do not overlap. This does not preclude, nor should it discourage him, from filing service connection for MIs, if he so chooses. To the contrary, service connection can be granted for the condition even though the rating criteria overlap. See, e.g., Amberman v. Shinseki, 570 F.3d 1377, 1380-81 (Fed. Cir. 2009). The instant determination is also not intended to prejudice his rating for that disability should he be subsequently service-connected for it. Nonetheless, for purposes of the instant appeal, a higher rating may not be assigned on the basis of his history of MIs, including a 100 percent rating "[d]uring and for three months following myocardial infarction, documented by laboratory tests." See 38 C.F.R. § 4.115, DC 7006. 

(Although the Veteran had cardiac catheterizations, it does not appear he has had coronary bypass surgery. Therefore, 38 C.F.R. § 4.104, DC 7017, is not implicated.)

For these reasons, an initial 30 percent disability rating for the Veteran's CAD is denied. This is true throughout the period of time during which his claim has been pending and therefore consideration of staged ratings is not warranted. Fenderson, supra.

2. Diabetes

Here, the Veteran's diabetes has been assigned staged ratings. A 20 percent rating was assigned for the period prior to March 6, 2014, and a 40 percent rating has been assigned since March 6, 2014. 

The schedule for rating diabetes is located under 38 C.F.R. § 4.119. The rating schedule is as follows:

7913 Diabetes mellitus

Requiring more than one daily injection of insulin, restricted diet, and regulation of activities (avoidance of strenuous occupational and recreational activities) with episodes of ketoacidosis or hypoglycemic reactions requiring at least three hospitalizations per year or weekly visits to a diabetic care provider, plus either progressive loss of weight and strength or complications that would be compensable if separately evaluated
100
Requiring insulin, restricted diet, and regulation of activities with episodes of ketoacidosis or hypoglycemic reactions requiring one or two hospitalizations per year or twice a month visits to a diabetic care provider, plus complications that would not be compensable if separately evaluated
60
Requiring insulin, restricted diet, and regulation of activities
40
Requiring insulin and restricted diet, or; oral hypoglycemic agent and restricted diet
20
Manageable by restricted diet only
10
Note (1): Evaluate compensable complications of diabetes separately unless they are part of the criteria used to support a 100 percent evaluation. Noncompensable complications are considered part of the diabetic process under diagnostic code 7913.

Note (2): When diabetes mellitus has been conclusively diagnosed, do not request a glucose tolerance test solely for rating purposes.


"Regulation of activities," as required to support a 40 percent rating, means that it is medically necessary for the claimant to avoid strenuous activities, both occupational and recreational. Camacho v. Nicholson, 21 Vet. App. 360, 363 (2007) ("The Court holds that medical evidence is required to support this criterion of a 40% disability rating-regulation of activities.").

The enumerated elements of DC 7913 required for a 40 percent rating are part of a structured scheme of specific, successive, cumulative (conjunctive) criteria for establishing a disability rating: each higher rating includes the same criteria as the lower rating plus distinct new criteria. Therefore, a 40 percent rating is not assignable under DC 7913 if the Veteran meets all the 20 percent criteria, but only 2 of the 3 criteria at the 40 percent level. See Middleton v. Shinseki, 727 F.3d 1172 (Fed. Cir. 2013) (the Veteran argued that that his disability status more nearly approximated the criteria required for the 40% than the 20% rating because control of his diabetes required regulation of activities, which is only associated with ratings equal to or exceeding 40%). 

40 Percent

In this Veteran's case, the RO assigned the 40 percent effective from March 6, 2014, based on the results of a VA examination conducted on that date. It is not in dispute that this VA examination shows that the Veteran's condition requires insulin, restricted diet, and regulation of activities. Accordingly, it is recognized that the Veteran meets the schedular criteria for a 40 percent rating. The central question in this appeal concerns when this disability level is first factually ascertainable. 

Although the RO assigned the effective date as of the date of the VA examination, "it is the information in a medical opinion, and not the date the medical opinion was provided that is relevant when assigning an effective date." Tatum v. Shinseki, 24 Vet. App. 139, 145 (2010) (discussing assignment of an effective date for a reduction in disability rating under DC 7528); see also Young v. McDonald, --- F.3d ----, 2014 WL 4400766, *3 (Fed. Cir. 2014) (, a medical opinion can diagnose the presence of the condition and identify an earlier onset date based on preexisting symptoms). 

When this matter was previously before the Board in January 2014, it was found that an August 2010 VA examination was inadequate to resolve the appeal because, in pertinent part, the examiner determined that the Veteran had no such restrictions of activities, but the examiner did not provide any explanation in support of this conclusion or address an August 2009 letter from the Veteran's private physician that asserts the claimant was restricted in his activities due to his marked diabetes mellitus. 

The Board now finds that it is factually ascertainable that the Veteran was restricted in his activities throughout the period of appellate review. As indicated, there is conflicting evidence as to this requirement. VA examiners in September 2005 and January 2008 found no restriction in activities. Yet, his private doctor wrote in August 2009 that the Veteran was "obviously restricted in his activities due to his rather marked diabetes mellitus for which he receives continuous treatments and because of his diabetic neuropathies especially of the lower extremities." The March 2014 VA examiner found that, according to a private doctor's note in August 2010, the Veteran had "restriction's due DM II with peripheral neuropathy, and following him since 1989."

His private doctor's treatment records show that he routinely advised the Veteran to exercise more. Representative of this advice, the doctor in March 2010 "encouraged him to add on a program of regular exercise," such as water aerobics. In fact, the Veteran informed his VA doctor in October 2006 that he walked two miles every morning with his sister. Yet, a February 2012 VA treatment record shows that he was advised to increase physical activity, but this was specified as "moderate" activity. This record makes it likely that the Veteran was continuously advised to increase his physical activity, but only to moderate activity. 

Accordingly, the private doctor's note, consistent with the April 2014 VA examination, is consistent with the whole evidentiary record showing a regulation of activities, that is avoidance of strenuous activities. When interpreting these reports of examination in the light of the whole recorded history, reconciling the various reports into a consistent picture, the Veteran's disability picture is at least equally likely manifested by restriction in activities throughout the period of appellate review. See 38 C.F.R. § 4.2. Accordingly, the record supports assignment of a 40 percent rating throughout the period of appellate review. Fenderson, supra.

There is some question as to whether the regulation of activities is due to the diabetes alone or a combination of his entire diabetic disease process. Notably, the August 2009 letter from his diabetic doctor specifies that the Veteran's restriction in activities is due to a combination of his diabetes and neuropathies in the lower extremities. The Board will further address this concern immediately below. 

Higher than 40 Percent

A rating higher than 40 percent is not warranted for the Veteran's diabetes as the evidence does not make it likely that the disability has resulted in episodes of ketoacidosis or hypoglycemic reactions requiring one or two hospitalizations per year or twice a month visits to a diabetic care provider, plus complications that would not be compensable if separately evaluated. 

To the contrary, the Veteran himself testified at his April 2010 Board hearing that he had had no emergency room visits for his diabetes. See Board Hr'g Tr. 13. Subsequent medical records, such as in June 2012, indicate that he may have had hypoglycemic episodes, but none requiring hospitalizations. There were also no episodes of ketoacidosis requiring hospitalization, as most recently shown at the March 2014 VA examination. 

In conclusion, the Board finds that a continuous 40 percent rating, but not higher, must be assigned for the Veteran's diabetes throughout the period of appellate review. Fenderson, supra.

3. Neuropathy

The Veteran has been assigned a 10 percent rating under DC 8520 for peripheral neuropathy of the left lower extremity and right lower extremity associated with diabetes mellitus since May 6, 2005. Since a May 2014 rating decision, the Veteran has also been assigned 10 percent ratings under DC 8526 for peripheral neuropathy, anterior crural nerve, right lower extremity, effective from March 6, 2014. Accordingly, the Veteran is assigned two 10 percent ratings for peripheral neuropathy of each lower extremity since March 6, 2014. The combined rating for each lower extremity is 20 percent from that date. See 38 C.F.R. § 4.25 ("[10 combined with 10 is 19]"). (The combined rating for both lower extremities, when adding 10 percent of the combined 36 percent disability rating under the bilateral factor, is 40 percent. See 38 C.F.R. §§ 4.25, 4.26.)

The schedule for rating these conditions is set forth under 38 C.F.R. § 4.124a. The rating schedule is as follows:

Sciatic nerve

8520 Paralysis of: 

Complete; the foot dangles and drops, no active movement possible of muscles below the knee, flexion of knee weakened or (very rarely) lost
80
Incomplete:

Severe, with marked muscular atrophy
60
Moderately severe
40
Moderate
20
Mild
10

Anterior crural nerve (femoral)

8526 Paralysis of: 

Complete; paralysis of quadriceps extensor muscles
40 
Incomplete: 

Severe
30 
Moderate
20 
Mild
10 

When evaluating diseases of the peripheral nerves, the term "incomplete paralysis," with this and other peripheral nerve injuries, indicates a degree of lost or impaired function substantially less than the type picture for complete paralysis given with each nerve, whether due to varied level of the nerve lesion or to partial regeneration. When the involvement is wholly sensory, the rating should be for the mild, or at most, the moderate degree. 38 C.F.R. § 4.124a. 

Here, the Veteran's peripheral neuropathy is assigned a 10 percent rating for each lower extremity prior to March 6, 2014. A combined 20 percent rating for each lower extremity is assigned beginning from that date. The Board finds that the 20 percent ratings are warranted throughout the period of appellate review. 

As a threshold matter, the evidence before the Board does not unequivocally confirm the diagnosis until April 2013. VA and private treatment records reflect such a diagnosis, but, as summarized by SSA in February 2007, "d[iagnosis] of peripheral neuropathy secondary to diabetes noted by multiple sources however not confirmed by nerve studies." The presence of diabetic neuropathy was not confirmed until objective testing was completed at VA in April 2013, which confirmed "sensorimotor peripheral neuropathy of mild severity due to a diabetic neuropathy." The March 2014 VA examination also found that the Veteran had diabetic neuropathy with symptoms involving "moderate" numbness, paresthesias and/or dysesthesias, and intermittent pain. There was decreased light touch and trophic changes involving smooth shiny skin, loss of hair of the legs. The March 2014 VA examiner found that this disability picture involved "mild" incomplete paralysis of both the sciatic nerve and femoral nerve (anterior crural). The VA examiner noted that the functional impact of this disability involved limitations to "light yard work; walking more than usual, long distance or standing for long periods, no stairs." 

The Board finds that the March 2014 VA examiner's "moderate" assessment is representative of the disability picture throughout the period of appellate review. Consistent with the VA examiner's assessment, the SSA evaluation in February 2007 found the Veteran's "major complaint related to this is pain in his feet, inhibiting his ability to stand/walk for prolonged periods. Multiple notes are received from the VA noting slow ambulation secondary to leg/foot pain he was prescribed diabetic shoes claimant w/ numerous complaints of nerve pain numbness and tingling 10/6/06 microfilament testing showed sensation to be absent claimant currently uses [medication] for neuropathic pain." Also representative, an April 2007 VA treatment record describes the Veteran as "ambulating with a walking cane with a steady gait."

These assessments reflect a review of the Veteran's disability picture over time. They accurately and comprehensively represent the disability picture, which involves pain and numbness in the leg and foot, which limits his ability to stand and walk. This disability level is best compensated by the a 20 percent rating, which compensates him for a "moderate" disability level. The Board can find no basis to support the staged 10 and 20 percent ratings. Therefore, the 10 percent ratings under DC 8526 should be made effective on May 6, 2005, such that there will be a combined 20 percent rating for each foot throughout the period of appellate review. Fenderson, supra.

A VA psychiatry record from May 2006 notes that the Veteran had "diabetes with severe neuropathy. He is badly crippled from the neuropathy and is about to have to give up his job driving a fork lift." This statement of "severe" neuropathy does not support a higher rating for two reasons. First, based on the context of this note, it appears most likely that the psychiatrist was simply noting the Veteran's own opinion as to the severity of the condition, rather than giving his independent medical opinion as to its severity. In fact, this psychiatrist was not treating the Veteran for neuropathy, so the statement appears out-of-context. In other words, it does not appear likely that a doctor treating a patient for depression would give an independent assessment as to the severity of neuropathy. Second, and correspondingly, even if the psychiatrist was stating his own opinion, the Board cannot rely on this opinion because the opinion itself creates the appearance of irregularity. That is, this psychiatrist may have expertise in psychiatry and related fields, but the statement that the neuropathy makes the Veteran "badly crippled" appears more consistent with a lay (non-expert) person's opinion. Thus, the Board can find no indicia indicating that the psychiatrist was attempting to state his professional medical opinion as to severity of the Veteran's neuropathy. See Wise v. Shinseki¸ 26 Vet. App. 517 (2014). Accordingly, the characterization of the condition as "severe" and "badly crippl[ing]" does not support assignment of a higher rating. 

Again, the Veteran's regulation of activities, supporting the 40 percent rating for diabetes, takes into consideration his diabetes and diabetic neuropathy. Accordingly, to increase the rating for the diabetic neuropathy any further would be compensating him for the same limitation under both the diabetic schedule and the diabetic neuropathy schedule. Evaluating the same manifestation under different diagnoses are to be avoided." 38 C.F.R. § 4.14. 

The Board finally notes that there was previously some question as to whether the Veteran may also have diabetic neuropathy in the left upper extremity. However, the March 2014 VA examiner addressed this question and found no such condition in the left upper extremity associated with diabetes. To the extent the Veteran otherwise wishes to pursue a claim of service connection for a condition in the left upper extremity, such as the shoulder, he is free to do so and this determination is in no way intended to represent a finding on the merits of such a claim if made at a later date. 



3. Other Complications

In the Remand section herein below, the Board is remanding claims for compensable ratings for diabetic foot ulcers and erectile dysfunction as the evidentiary record is not entirely adequate to evaluate those conditions, if they exist. 

Otherwise, a January 2008 VA examination notes diabetic complications involving dysuria, constipation, anal pruritus, and loss of strength. This appears to have been a typographic error, however, because the examiner's narrative section immediately following indicates that such symptomatology was not present. More recent assessments also make it likely that the VA examiner's positive responses for dysuria and anal pruritus were in error, because neither the VA nor private treatment records indicate such symptomatology associated with diabetes. It is reasonably expected that routine medical consultations would identify such complications if present, but they do not. See AZ v. Shinseki, 731 F.3d 1303 (Fed. Cir. 2013); See Buczynski v. Shinseki, 24 Vet. App. 221, 224 (2011). Most recently, the March 2014 VA examiner found no such conditions resulting from diabetes. Accordingly, the Board has no basis for assigning a separate compensable rating for dysuria, loss of strength, or anal pruritus. 


ORDER

Service connection for a respiratory disorder, manifested by COPD, is denied. 

An initial disability rating in excess of 30 percent for coronary artery disease is denied at all times during the pendency of the appeal.

An initial 40 percent rating, but not higher, for type II diabetes mellitus is granted at all times during the pendency of the appeal.

An initial disability rating in excess of 10 percent for peripheral neuropathy of the right lower extremity is denied at all times during the pendency of the appeal.

An initial 10 percent rating, but not higher, for peripheral neuropathy, anterior crural nerve, of the right lower extremity is granted at all times during the pendency of the appeal.

An initial disability rating in excess of 10 percent for peripheral neuropathy of the left lower extremity is denied at all times during the pendency of the appeal.

An initial 10 percent rating, but not higher, for peripheral neuropathy, anterior crural nerve, of the left lower extremity is granted at all times during the pendency of the appeal.


REMAND

The Veteran's claim for a higher disability rating for diabetes now raises the issue of whether compensable ratings are warranted for diabetic foot ulcers and erectile dysfunction. The evidentiary record is not entirely adequate to evaluate those conditions at present. As such, new VA examinations are necessary. See 38 U.S.C.A. § 5103A(d); McLendon v. Nicholson, 20 Vet. App. 84-86 (2006).

As explained above, the record raises a claim for a TDIU. See Rice. However, the Board finds that the TDIU issue is not as yet fully developed for appellate review. Specifically, the Board notes that the Veteran has not been provided with notice of the laws and regulations governing a TDIU in a statement of the case or supplemental statement of the case or an adequate examination to obtain an opinion as to whether his service connected disabilities prevent him from working. Therefore, the Board finds that a remand for such development is required. Id; Also see 38 U.S.C.A. § 5103A.

The issues of (1) entitlement to an extraschedular rating on an individual or combined disability basis and (2) entitlement to a TDIU are intertwined with the outcome of the determinations regarding those issues. Therefore, the Board finds that adjudication of these claims must be placed on hold until the AOJ completes the above development. See Harris v. Derwinski, 1 Vet. App. 180, 183 (1991) (holding that where a claim is inextricably intertwined with another claim, the claims must be adjudicated together in order to enter a final decision on the matter).

While the appeal is in Remand status, the AOJ should also obtain and associate with the claims file any relevant outstanding treatment records. See 38 U.S.C.A. § 5107A(b) (West 2002). 

Accordingly, this issue is REMANDED to the AOJ for the following actions:

1. After obtaining any needed authorizations from the Veteran, physically or electronically associate with the claims file any relevant outstanding treatment records including from the Montgomery VA Medical Center.

2. Provide the Veteran with notice of the laws and regulations governing a TDIU in accordance with 38 U.S.C.A. § 5103A which notice also tells him that he may submit lay statements from himself and from other individuals who have first-hand knowledge of the nature, extent and severity of his service-connected disabilities, to include the impact of the conditions on his ability to work. The notice letter should also request a detailed statement regarding the Veteran's post-service work history as well as all of his education and training. 

3. After undertaking the above development to the extent possible, arrange for a VA examination to evaluate the severity of the Veteran's diabetes complications involving diabetic foot ulcers and erectile dysfunction. A copy of this remand and all relevant medical records should be made available to the examiner. Accordingly, the examiner is asked to review the pertinent evidence, including the Veteran's lay assertions, and undertake any indicated studies. Then, based on the results of the examination, the examiner is asked to address each of the following questions:

(a) Does the Veteran have complications of diabetes involving foot ulcers? If so, please describe the severity of that condition.

(b) Does the Veteran have, as a complication of diabetes, erectile dysfunction? If so, please describe the severity of that condition.

The examiner is asked to identify, to the extent possible, the date on which each varying degree of impairment first occurred.

All opinions and conclusions reached by the examiner should be justified.

4. Provide the Veteran with an appropriate VA examination, to be conducted, if possible, by a vocational rehabilitation specialist with respect to his TDIU claim. The claims file should be made available to the examiner and all appropriate tests should be performed. The examiner must opine as to whether, without regard to the Veteran's age or the impact of any nonservice-connected disabilities, it is at least as likely as not that his service-connected disabilities, alone or in the aggregate, render him unable to secure or follow a substantially gainful occupation. In offering this impression, the examiner must acknowledge and take into account this Veteran's education, training, and work history. All finding and conclusions should be set forth in a legible report, accompanied by a rationale.

5. After completing all actions set forth above, plus any further action needed as a consequence of the development completed above, readjudicate the remanded claims with consideration of all pertinent evidence and legal authority and addressing all relevant theories of entitlement, including (a) extraschedular referral on an individual or collective basis and (b) a TDIU.

6. If any benefit sought on appeal remains denied, furnish to the Veteran and his representative an appropriate supplemental statement of the case (SSOC) that includes clear reasons and bases for all determinations. A reasonable period of time should be allowed for response before the appeal is returned to the Board.

The Veteran has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

These claims must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board or by the United States Court of Appeals for 


Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West Supp. 2013).



____________________________________________
NEIL T. WERNER
Acting Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs